UNITED TRANSPORTATION UNION, LOCAL LODGE #693–E AND LOCAL LODGE #77, Plaintiffs,

v.

BURLINGTON NORTHERN, INC., a corporation, Duluth, Winnipeg and Pacific Railway Company, a corporation, Chicago & North Western Railway Company, a corporation, and the Lake Superior Terminal and Transfer Railway Company, a corporation, Defendants.

No. 5–70 Civ. 19.

United States District Court,
D. Minnesota,
Fifth Division.

Oct. 9, 1970.

Rerat, Crill, Foley & Boursier, by Pattrick J. Foley, Minneapolis, Minn., for plaintiffs.

James R. Walker, St. Paul, Minn., for defendant Burlington Northern, Inc.

Sullivan, Hanft, Hastings, Fride & O'Brien, by Richard H. Hastings, Duluth, Minn., for defendant Duluth, Winnipeg & Pacific Ry.

Stringer, Donnelly, Allen & Sharood, by Philip Stringer, St. Paul, Minn., Louis T. Duerinck and Robert Schmiege, Chicago, Ill., for defendant Chicago & North Western Ry.

Powell, Gee & Powell, by Robert H. Gee, Superior, Wis., for defendant Lake Superior Terminal & Transfer Ry.

NEVILLE, District Judge.

Plaintiffs' motion for preliminary or temporary injunction presents first the question as to whether three railroads, without objection from the fourth, may effect certain switching and operating

changes in the Duluth, Minnesota-Superior, Wisconsin area without prior application to and approval by or obtaining a certificate from the Interstate Commerce Commission under 49 U.S.C. §§ 1(18) and 5(2) (a) (ii) and, second, the question as to whether the giving of a notice under Section 6 of the Railway Labor Act, 45 U.S.C. § 156 permits or requires this court to issue a temporary injunction to maintain status quo pending the conducting of mediation proceedings.

Plaintiffs are two local lodges of the United Transportation Union and assert that as a result of what they claim to be illegal action on the part of the defendant railroads some 25 to 30 union members who are long-time employees of the Lake Superior Terminal and Transfer Railway Corporation (LST & T) have become unemployed and are more than likely so to remain. The defendants are (1) the Burlington Northern, Inc. (BN) successor by merger effected on March 2, 1970 to the former Great Northern Railway Company (GN) and the Northern Pacific Railway (NP) and which now owns and operates over the trackage of the former NP the Duluth-Superior area; (2) Duluth, Winnipeg and Pacific Railway Company (DW & P) whose tracks extend from approximately their termination at West 44th Street in Duluth, Minnesota, where they connect with the BN tracks, northerly to International Falls, Minnesota with connections beyond and into Canada; (3) Chicago and North Western Railway Company (C & NW) whose subsidiary Chicago, St. Paul, Minneapolis and Omaha Railway Company (Omaha) owns trackage and operates in the Duluth-Superior area; (4) Lake Superior Terminal and Transfer Railway Corp. (LST & T) which is owned two-thirds by BN, one-sixth by C & NW and one-sixth by the Minneapolis, St. Paul and Sault Ste. Marie Railroad Company (Soo Line—not a party in this action); LST & T owns and operates a transfer railroad with a yard in Superior, Wisconsin and is engaged in switching and transferring of cars delivered to it by one carrier and in due course transmitted by it to another carrier.

Since 1912, DW & P has had, under a written agreement, limited trackage rights over some few miles of what are now BN tracks from 44th Avenue West to near 16th Avenue West in Duluth so as to effect a connection with, and to permit transshipment of cars to and from C & NW at its Fifth Avenue yard at Duluth. A written agreement of April 13, 1912 with the then NP permitted use of the latter's above stretch of trackage but limited the use of such to passenger, lakebound or local freight with a total of six revenue trains per day and subject to certain other restrictions. In accordance with these restrictions, all "through" cars, that is those not to be terminated or unloaded in the Duluth-Superior area, travelled over a route, across "grassy point" or the St. Louis Bay bridge either to or from the yards of LST & T and there by LST & T crews switched or interchanged to C & NW or to DW & P as the case might be. Over the years there were several exceptions to this practice: (a) a period of a week in 1961 until NP apparently objected; (b) occasionally when either carrier by using LST & T would miss a connection; (c) lake cars, i. e., those whose contents were to be unloaded onto lake boats; (d) purely local freight not destined beyond the Duluth-Superior area; (e) passenger traffic, now virtually if not completely non-existent.

March 2, 1970 the long pending merger between GN and NP became final. One of the conditions thereof reads as follows:

"30. [BN] shall (1) grant such trackage rights at Duluth, Minn., to Duluth, Winnipeg & Pacific 'Railway, upon terms mutually agreeable, as will permit the latter to handle through traffic between the present connection of that railroad and Northern Pacific in Duluth to the connection of the North Western and Northern

Pacific in Duluth, and (2) grant such trackage rights to North Western at Head of the Lakes, upon terms mutually agreeable as will permit the latter to handle such traffic over St. Louis Bay Bridge and related facilities."

Neither C & NW nor DW & P are of course parties to the BN merger agreement, though the court deduces from statements at the oral argument that one of the considerations for the withdrawal of objections by one or both of these carriers to the merger agreement was the commitment or requirement that BN remove the restrictions of the 1912 agreement and permit more direct interchange than through the LST & T.

Since on or about March 13, 1970, no, or very little, traffic "through" or otherwise, has been routed to or handled in the LST & T yards or by its personnel when being transferred between C & NW and DW & P or vice versa. Apparently a modification of the 1912 written agreement has been effected and the more direct route from DW & P over BN tracks to the C & NW Duluth yards for "through" cars has been used thereby avoiding the LST & T yard. The total traffic is alleged to be as high as 200 cars per day actually switched at the C & NW Fifth Avenue Duluth yards. It is this rerouting of traffic which is claimed to have caused the lay-off of between 25 to 30 LST & T employees, thus engendering this lawsuit.

Plaintiffs claim first that the change effected between the two aforesaid roads and BN, whose tracks are used in part, cannot be made without approval of the Interstate Commerce Commission under either 49 U.S.C. § 1(18) or 49 U.S.C. § 5(2) (a) (ii). The former requires under certain circumstances and conditions an Interstate Commerce Commission certificate of convenience and necessity for an extension or an abandonment of railroad lines, which plaintiffs claim are both involved here. The latter statute requires Interstate Commerce Commission approval before a carrier may acquire trackage rights over another railroad line, which plaintiffs also claim is involved in this case.

Defendants claim that the change effected is not such as requires a certificate of convenience and necessity for there is no new acquisition but merely a removal of restrictions on use and no abandonment of any trackage; that the situation is not similar to a spur track since it is over the main line of the BN that cars travel to get to and from the LST & T yards; and that in any event, the imposition of condition 30 in the merger decision above quoted is the equivalent of or will stand in lieu of such a certificate and approval since it uses the word "shall", as distinguished from condition 21 of the same merger decision, relating to the Soo Line, which specifically requires such I.C.C. approval. DW & P asserts that for many years it has been paying a "tribute" to LST & T by the useless switching in interchange, which is wholly uneconomical, and asserts that it should be relieved of any such requirement. BN moves to dismiss as to it because it deems itself not a party to the controversy, its tracks being used in any event whichever way the controversy is solved, the only difference being the route. LST & T regards itself as somewhat "in the middle" in that two outside parties have made an agreement to which it is not *particeps,* that it is not happy with the reduction in business but cannot take any action other than it did in laying off employees. It is of course owned five-sixths by two of the defendants in this case. LST & T particularly argues against the claimed effect of the Sec. 6 notice under the Railway Labor Act, contending among other things that this is not a "major dispute".

■ The court is of the opinion it should grant the preliminary or temporary injunction requested by plaintiff. Congress, in the drafting of the Interstate Commerce Commission Act and the Transportation Act of 1940 was jealous, of rights of employees, as evidenced by

49 U.S.C. § 5(2) (f) which states in part:

" * * * As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. * * * "

In Soo Line Railroad Company v. United States, 280 F.Supp. 907 (D.Minn.1968), a three-judge court provided an exhaustive analysis of the intent of Congress in passing the above section and concluded that the section provides protection to the employees of the applicant railroads and also the employees of any protected railroads. The court quoted a portion of the Commerce Commission's opinion in Chesapeake-O. Ry. Co.—Control-Western Maryland Ry. Co., 328 I.C. C. 684 (1967), which stated:

" * * * The terms of section 5, particularly section 5(2) (c) and (f), implicitly recognize that the working conditions and morale of rail employees are important elements to the maintenance and preservation of an efficient and economical transportation system. * * * "

The court proceeded to hold that the employees of the Soo Line Railroad are protected under 5(2) (f) even though the Soo Line was not an applicant in the Commission proceedings, if it is likely that they will be "injured" as a result of the Commission's order.

■ The plaintiffs represent a group of men who have suffered and are suffering an economic loss and thus in the court's opinion have standing to bring this lawsuit. As the result of actions of carriers by whom they are not employed and over whom they of course have no control, they are suddenly unemployed. If in fact such action by the carriers is illegal, or improper, or needs further authorization or approval by the I.C.C. these plaintiffs in the court's opinion have a right to challenge the same. The

court is aware that one of the very purposes of a merger such as the GN and NP into BN was to effect operational savings and to enable better service to the public. It may well be that to accomplish such, some casualties are bound to occur. Progress, if such it be tends to trod on someone's toes. Nevertheless, the practice existing up to March 2, 1970 had been extant for some 58 years, since 1912. A little further delay before the finality of such a change if such is proper cannot be irreparable. The court does not have the expertise of the I.C.C. in railroad matters such as at hand so as to be able with facility to rule on the merits of the various questions involved, i. e., whether the change here is an "extension" or an "abandonment" within the meaning of 49 U.S.C. § 1(18) or in some other way requires a certificate thereunder; whether the amendment of the 1912 DW & P–NP agreement requires approval under 49 U.S.C. § 5(2) (a) (ii); whether in a case such as this where economic loss to employees has occurred without any alleviating attempt by the carrier or carriers involved is a subject for consideration; whether there are any other questions which are more properly initially heard before and determined by the Interstate Commerce Commission, subject ultimately to review by this court—or perhaps more properly by a three-judge Federal Court. *Quaere*, however, as to the effect if any of the fact the merger decision or plan already has been approved by the United States Supreme Court. Northern Lines Merger Cases, 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). All these questions are best first determined by the administrative agency, the Interstate Commerce Commission. The court deliberately and intentionally is not passing on the merits of any of the above questions nor the various contentions of the parties.

It may or may not be that the Interstate Commerce Commission, in approving the BN merger with Condition 30 contained as a part thereof deems that it has already passed on the issues of this

case and all questions relating thereto. If so, presumably it will so state promptly, though the court has been furnished by both parties with an exchange of correspondence with the Chairman of the Interstate Commerce Commission indicating some possible doubt at least on his part concerning this question.

■ The BN's motion for dismissal is denied. It is a party to the modification of the DW & P agreement originally made by its predecessor NP in 1912, albeit it claims it is required by Condition 30 so to do and that if it fails to act it is answerable. As to plaintiffs' claims for damages, such were dismissed by plaintiffs' counsel with prejudice in open court in the record at the hearing. In view of the temporary injunction ordered by this court herein the court need make no decision as to the applicability of Section 6 of the Railway Labor Act to the case at bar.

A separate order has been entered.