LAMOILLE VALLEY RAILROAD
COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Guilford Transportation Industries, Inc., Robert W. Meserve and Benjamin H. Lacy, Trustees of the Property of Boston and Maine Corporation, Debtor, Eastern Magnesia Talc Company, State of Vermont, Intervenors.

PROVIDENCE AND WORCESTER
RAILROAD COMPANY,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Guilford Transportation Industries, Inc., Robert W. Meserve and Benjamin H. Lacy, Trustees of the Property of Boston and Maine Corporation, Debtor, State of Vermont, Intervenors.

STATE OF VERMONT, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Guilford Transportation Industries, Inc., Robert W. Meserve, et al., Intervenors.

CANADIAN NATIONAL RAILWAY COMPANY, Central Vermont Railway, Inc., Grand Trunk Western Railroad Company and Detroit, Toledo and Ironton Railroad Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Robert W. Meserve and Benjamin H. Lacy, Trustees of the Property of Boston and Maine Corporation, Debtor, Intervenors.

Nos. 82–1498, 82–1523, 82–1578
and 82–1668.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 1983.

Decided June 28, 1983.

Robert R. Gensburg, St. Johnsbury, Vt., for Lamoille Valley R. Co., petitioner in No. 82–1498.

Robert P. vom Eigen, Washington, D.C., with whom Charles A. Spitulnik, Washington, D.C., was on the brief, for Canadian National R. Co., et al., petitioners in No. 82–1668.

Joseph L. Manson, III, Washington, D.C., with whom John L. Richardson and Thomas E. Acey, Jr., Washington, D.C., were on the brief, for Providence and Worcester R. Co., petitioner in No. 82–1523. Debra L. Willen, Washington, D.C., also entered an appearance for petitioner.

Robert L. Calhoun, Boston, Mass., was on the brief for the State of Vt., petitioner in No. 82–1578 and intervenor in No. 82–1498 and 82–1523. Paulette S. Kessler, David M. Schwartz, Boston, Mass., and Robert C. Schwartz, Montpelier, Vt., also entered appearances for petitioner and intervenor.

Edward J. O'Meara, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I.C.C., and John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. John J. McCarthy, Jr., Atty., I.C.C., Washington, D.C., also entered an appearance for respondents.

James E. Howard, Pittsburgh, Pa., with whom Kathleen D. Hendrickson and Robert M. Owsiany, Pittsburgh, Pa., were on the brief, for intervenor, Guilford Transp. Industries, Inc.

Hugh P. Morrison, Jr., and Rand McQuinn, Washington, D.C., were on the brief, for intervenor, Eastern Magnesia Talc Co. Donald J. Mulvihill and William J. Sweeney, Washington, D.C., also entered appearances for intervenor.

Charles W. Mulcahy, Jr., Boston, Mass., was on the brief, for intervenor, Trustees of the Property of Boston and Maine Corp., debtor.

Before WILKEY and WALD, Circuit Judges, and BONSAL,* Senior District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge WALD.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. STATUTORY AND FACTUAL BACKGROUND | 300 |
| A. The Statutory Scheme | 300 |
| 1. Specific Provisions Governing Railroad Mergers | 300 |
| 2. Congressional Policy on Railroad Mergers | 301 |
| B. ICC Railroad Merger Policy | 302 |
| C. The Railroads Involved in this Case | 303 |
| D. Proceedings Below | 303 |
| 1. Conditions Requested by the Boston & Maine's Competitors | 303 |
| 2. The ICC's Decision | 304 |
| E. Issues Presented | 304 |
| II. THE FINANCIAL VIABILITY OF THE BOSTON & MAINE | 305 |
| III. LAMOILLE VALLEY'S REQUEST FOR PROTECTIVE CONDITIONS | 307 |
| A. Standard of Review | 307 |
| B. The ICC's Decision | 308 |
| C. The Essential Services Test | 309 |
| 1. Current or Past Truck Service | 310 |
| 2. Business Termination | 310 |
| 3. Conclusion | 313 |
| D. Anticompetitive Effect | 313 |
| IV. CANADIAN NATIONAL'S REQUEST FOR PROTECTIVE CONDITIONS | 315 |
| A. The ICC's Decision | 315 |
| B. The Limited Relevance of Systemwide Revenues | 316 |
| C. Guilford's Intent to Maintain Present Service | 317 |
| D. Guilford's Incentives to Downgrade Interchange Service | 318 |
| 1. Guilford's Incentives in Antitrust Theory | 318 |
| 2. Guilford's Actual Incentives | 319 |
| E. Canadian National's Competitive Leverage | 320 |
| F. Potential Harm from Protective Conditions | 321 |
| G. Conclusion | 322 |
| V. LABOR PROTECTIVE CONDITIONS | 323 |
| VI. PROCEDURAL ISSUES | 324 |
| A. Must Mr. Mellon Join the Merger Application? | 324 |
| B. The Expedited Procedural Schedule | 326 |
| C. ICC Jurisdiction over Holding Company Securities | 329 |
| D. Failure to Apply for Control of the Vermont & Massachusetts Co. | 330 |
| E. Premature Control of the Boston & Maine | 330 |
| VII. CONCLUSION | 331 |

WALD, Circuit Judge:

We review here a decision of the Interstate Commerce Commission (ICC or Commission) approving unconditionally the merger of the Maine Central Railroad with the Boston & Maine Railroad. *Guilford Transportation Industries—Control—Boston & Maine Corp.*, 366 I.C.C. 292 (1982) [hereinafter cited as *Boston & Maine Merger*].[1] Petitioners, competitors of the Boston & Maine, asked the ICC to protect them from competitive harm due to the merger by imposing various conditions on the merged entity (including sale of track, trackage rights, and preservation of swift traffic interchanges). The ICC declined to impose any protective conditions, finding that none of the petitioners had shown that the conditions it requested were needed to prevent the loss of "essential services."

Petitioners appeal to this court, claiming that the ICC's "essential services" test for imposing protective conditions is too strict and does not comply with the statutory directive that the ICC consider the effect of the merger on "adequacy of transportation to the public." 49 U.S.C. § 11,344(b)(1). Petitioners also argue that some of the ICC's findings are not supported by substantial evidence and that the ICC committed a variety of procedural errors. We reject the procedural challenges as either without merit or not constituting prejudicial error. We conclude, however, that the ICC's essential services test, as applied to petitioner Lamoille Valley Railroad, does not comport with the statute. We also find flaws in the agency's reasoning with regard to protective conditions requested by petitioner Canadian National Railway. We therefore affirm in part, reverse in part, and remand to the ICC to determine whether protective conditions are needed to protect the public's right to adequate transportation.

## I. STATUTORY AND FACTUAL BACKGROUND

### A. The Statutory Scheme

#### 1. Specific Provisions Governing Railroad Mergers

Interstate Commerce Act, 49 U.S.C. § 11,343(a), requires the ICC to review all railroad mergers.[2] The ICC must approve any merger that is "consistent with the public interest," but can impose conditions on the merger when needed to advance the public interest:

> The Commission shall approve and authorize a [merger] when it finds the transaction is consistent with the public interest. The Commission may impose conditions governing the transaction.

> (1) consolidation or merger . . . of at least 2 carriers into one corporation . . . .
>
> . . . .
>
> (3) acquisition of control of a carrier by any number of carriers.
> (4) acquisition of control of at least 2 carriers by a person that is not a carrier.
> (5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.
>
> We use the term "merger" as shorthand for the achievement of common control in any of these ways.

---

1. The ICC shortly thereafter approved unconditionally the merger of the combined Boston & Maine/Maine Central with the Delaware & Hudson Railroad. *Guilford Transp. Indus.—Control—Delaware & Hudson Ry.*, 366 I.C.C. 396 (1982) [hereinafter cited as *Delaware & Hudson Merger*]. We review the ICC's decision concerning the Delaware & Hudson in a companion case to this one, also issued today. *Central Vt. Ry. v. ICC*, 711 F.2d 331 (D.C.Cir. 1983).

2. 49 U.S.C. § 11,343(a) provides, in pertinent part:
 The following transactions . . . may be carried out only with the approval and authorization of the Commission:

*Id.* § 11,344(c).[3] In making the "public interest" determination for a proposed merger of two "class I" railroads,[4] the ICC must consider five specific (but not exclusive) factors:

(A) the effect of the proposed transaction on the adequacy of transportation to the public.

(B) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

(C) the total fixed charges that result from the proposed transaction.

(D) the interest of carrier employees affected by the proposed transaction.

(E) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.

*Id.* § 11,344(b)(1).

### 2. *Congressional Policy on Railroad Mergers*

These statutory provisions must be interpreted in light of the longstanding congressional policy favoring railroad mergers that increase efficiency and quality of service. Since 1920, the ICC has operated under "the congressional policy of encouraging consolidation of the Nation's railroads." *Penn-Central Merger & N & W Inclusion Cases,* 389 U.S. 486, 492, 88 S.Ct. 602, 605, 19 L.Ed.2d 723 (1968). The Railroad Revitalization and Regulatory Reform Act of 1976

("4R Act"), Pub.L. No. 94–210, 90 Stat. 31 (current version in scattered sections of 45, 49 U.S.C.), reinforces that policy.

The 4R Act did not alter the substantive "public interest" standard for ICC approval of railroad mergers, but did provide new, expedited procedures for ICC review of merger proposals as an alternative to the existing procedures.[5] It also declared Congress' purposes to include:

the encouragement of efforts to restructure the [rail] system on a more economically justified basis, including . . . an expedited procedure for determining whether merger and consolidation applications are in the public interest.

*Id.* § 101(a)(2), 45 U.S.C. § 801(a)(2).

The Senate committee report explained that the new procedures were needed because "[t]he cumbersome, slow process of . . . processing merger proposals . . . has drastically slowed change needed in the industry." S.Rep. No. 499, 94th Cong., 1st Sess. 2–3 (1975), *reprinted in* 1976 U.S.Code Cong. & Ad.News 14, 16. The committee expected the new procedures to "encourage mergers, consolidations and joint use of facilities that tend to rationalize and improve the Nation's rail system." *Id.* at 20, 1976 U.S.Code Cong. & Ad.News at 34. Similarly, the House expected that the new procedures would permit railroads "to voluntarily rationalize the system in a short period of

---

**3.** The sentence in § 11,344(c) referring to conditions does not explicitly refer to the "public interest." Nevertheless, the context strongly suggests, and the legislative history establishes beyond cavil, Congress' intent that the Commission apply the same "public interest" test both to the basic merger and to any conditions it imposes on the merger. Prior to 1978, the Act directed the ICC to approve a merger if the Commission "finds that, subject to such terms and conditions and such modifications as it shall find to be *just and reasonable,* the proposed transaction is . . . consistent with the public interest." 49 U.S.C. § 5(2)(b) (1976) (emphasis added). The Interstate Commerce Act was recodified to its current form in 1978 "without substantive change." 49 U.S.C. note preceding § 10,101. The revisers deleted the words "just and reasonable" as redundant "in view of the words 'the transaction is consistent

with the public interest.' " 49 U.S.C. § 11,344 revision note.

We therefore reject the suggestions by Guilford and the ICC that the Commission has broader discretion in imposing conditions on a merger than in approving or rejecting the merger as a whole.

**4.** The ICC defines "class I" railroads as those railroads with annual operating revenues of $50 million or more. 49 C.F.R. § 1240.1(a) (1982). Under that definition, both the Maine Central and the Boston & Maine are class I railroads.

**5.** *See* 4R Act, §§ 402 (amending existing law), 403 (providing new, alternative procedures), 90 Stat. 31, 62–66 (1976) (current version at 49 U.S.C. §§ 11,345, 11,346).

time." H.R.Rep. No. 725, 94th Cong., 1st Sess. 63 (1975).[6]

The Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (amending 49 U.S.C. §§ 10,101–11,917), also shows Congress' endorsement of mergers that enhance railroad efficiency. The Staggers Act did not change the Interstate Commerce Act provisions governing mergers of two or more class I railroads. However, it substantially deregulated the railroad industry in a variety of ways (notably rate-setting practices) and established "the policy of the United States Government . . . to minimize the need for Federal regulatory control over the rail transportation system" and "to foster sound economic conditions in transportation." 49 U.S.C. § 10,101a(2), (5).

### B. ICC Railroad Merger Policy

In response to the congressional directives in the 4R Act and the Staggers Rail Act, the ICC has established policy guidelines which favor railroad mergers that improve efficiency and disfavor imposing conditions on a merger that might reduce potential efficiency gains. 49 C.F.R. § 1180.1 (1982); see Railroad Consolidation Procedures, 363 I.C.C. 200 (1981) (statement of basis and purpose).[7] In general, the Commission "encourages . . . rationalization of the nation's rail facilities and reduction of its excess capacity." 49 C.F.R. § 1180.1(a) (1982). In deciding whether a merger is in the public interest, the Commission "performs a balancing test," weighing "the potential benefits to applicants and the public against the potential harm to the public." Id. § 1180.1(c).

In weighing potential harm to the public, the ICC considers two principal factors— the degree of reduction of competition from a merger and the harm, if any, to "essential services." In determining whether competition will be significantly reduced, the Commission considers both "intramodal" competition among rail carriers and "intermodal" competition with trucks, barges, pipelines, and ships. Id. § 1180.1(c)(2)(i). The ICC defines rail service as "essential" if "there is a sufficient public need for the service and adequate alternative transportation is not available." Id. § 1180.-1(c)(2)(ii). The Commission does not take into account potential harm to individual competitors (except insofar as harm to competitors significantly reduces competition) because it is concerned only with rail service to the public, "not the survival of particular carriers." Id. § 1180.1(c)(2)(ii).

The ICC believes that protective conditions are generally not in the public interest because they "may lessen the benefits of a consolidation to both the carrier and the public." Id. § 1180.1(d)(1). It recognizes that competition creates an incentive to provide efficient service and therefore will impose conditions when needed to "ameliorat[e] potential anticompetitive effects of a consolidation." But it "will not normally impose conditions" on a merger "to protect a carrier" unless the conditions are needed to preserve "essential services" and will neither impose "unreasonable" costs on the consolidated carrier nor "frustrate the ability of the consolidated carrier to obtain the anticipated public benefits." Id.[8]

---

**6.** See also H.R. 10,979, 94th Cong., 1st Sess. § 101(3)–(4), reprinted in H.R.Rep. No. 725, 94th Cong., 1st Sess. 3 (1975):

The Congress finds and declares that—

. . . .

(3) a clear need exists to eliminate duplication, inefficiency, and deterioration of the rail plant and equipment of the Nation's railroads;

(4) procedures . . . with respect to . . . mergers and consolidation . . . have become obsolete and have often been an obstacle to the improvement of rail efficiency . . . .

**7.** At the time the ICC issued its decision in this case, these guidelines were codified at 49

C.F.R. § 1111.10 (1981). For convenience, we cite to the current codification in 49 C.F.R. § 1180.1.

**8.** 49 C.F.R. § 1180.1(d)(1) (1982) provides:

The Commission has broad authority to impose conditions on consolidations, including those that might be useful in ameliorating potential anticompetitive effects of a consolidation. However, the Commission recognizes that conditions may lessen the benefits of a consolidation to both the carrier and the public. Therefore, the Commission will not normally impose conditions on a consolidation to protect a carrier unless essential serv-

## C. *The Railroads Involved in this Case*

Guilford Transportation Industries (Guilford) is a holding company that is 100% owned by Timothy Mellon. Guilford owns the Maine Central Railroad, a profitable railroad with a near-monopoly over rail service to the Maine paper and forest products industries.

The bulk of the traffic carried by the Maine Central originates in Maine and travels west (to Montreal, Buffalo, Chicago, etc.) or south (to Boston, New York, and the mid-Atlantic states); there are also significant shipments of grain from the Midwest to the Maine poultry industry. Rail traffic that originates on the Maine Central can move *south* over the Boston & Maine Railroad. Traffic from the Maine Central can move *west* over four routes: over the Canadian National Railway to Montreal and points west; over the Canadian Pacific Railroad to Montreal and points west; over the Lamoille Valley Railroad to the Canadian National to Montreal and points west; and over the Boston & Maine to Albany and from there via Conrail or the Delaware & Hudson Railroad to Buffalo and points west.

The Canadian National and the Canadian Pacific are large and profitable transcontinental railroads. The Lamoille Valley operates a single 98-mile east-west line between Swanton, Vt. (its western gateway, connecting to the Canadian National) and St. Johnsbury, Vt. (its eastern gateway, connecting to the Maine Central). Only a small volume of traffic originates or terminates on Lamoille Valley's line. Thus, it depends on "overhead" traffic (carried from the Maine Central over the Lamoille Valley to the Canadian National or vice-versa) for financial viability. Even with its current level of overhead traffic, the Lamoille Valley has been only marginally profitable, and then only because the State of Vermont spent some $16 million during the 1970's in upgrading Lamoille Valley's track and equipment.

The Boston & Maine operates east-west and north-south rail lines in Vermont, New Hampshire, Massachusetts, Connecticut, and New York. It is bankrupt and has been in reorganization since 1970. The Boston & Maine has lost money for the last 25 years; its revenue insufficient to support its extensive network of rail lines.[9]

The Providence & Worcester is a small, profitable railroad serving Rhode Island and Connecticut. It connects primarily with the Boston & Maine and the Canadian National in the north and Conrail in the west.

## D. *Proceedings Below*

On October 28, 1981, Guilford applied to the ICC for permission to acquire the Boston & Maine. Its plan to make the Boston & Maine profitable depended on three major elements: federal subsidy (in the form of low-interest loans); operating cost savings from merging the Boston & Maine with the Maine Central; and increased revenue from diverting to the Boston & Maine some of the east-west traffic that now travels over the Canadian National, the Canadian Pacific, or the Lamoille Valley.

### 1. *Conditions Requested by the Boston & Maine's Competitors*

Petitioner Lamoille Valley did not oppose the basic merger. Lamoille Valley claimed, however, that diversion of east-west traffic from it to the Boston & Maine would cause

ices are affected and the condition: (i) is shown to be related to the impact of the consolidation; (ii) is designed to enable shippers to receive adequate service; (iii) would not pose unreasonable operating or other problems for the consolidated carrier; and (iv) would not frustrate the ability of the consolidated carrier to obtain the anticipated public benefits. Moreover, the Commission believes that indemnification is ordinarily not an appropriate remedy in consolidation pro-

ceedings. Indemnification conditions can be anticompetitive by requiring the consolidated carrier to subsidize carriers who are no longer able to compete efficiently in the marketplace.

9. *See In re Boston & Maine Corp.,* No. 70–250–M, mem. op. at 2 (D.Mass. opinion issued Feb. 23, 1983), *appeal filed,* No. 83–1086 (1st Cir. Feb. 3, 1983).

it to go bankrupt. Lamoille Valley therefore sought to obtain a substitute source of revenue by purchasing part of a Boston & Maine line that would carry some of the diverted traffic.

Petitioner Canadian National [10] also did not oppose the overall merger. It was concerned, however, that Guilford might seek to increase traffic diversion from the Maine Central/Canadian National east-west route to the Maine Central/Boston & Maine route by delaying the interchange of traffic between the Maine Central and the Canadian National. This would reduce the time advantage of the Maine Central/Canadian National route over the Maine Central/Boston & Maine route. Canadian National therefore asked the ICC to require Guilford to maintain current interchange service at Danville and Yarmouth Junctions, Maine.[11]

Petitioner Providence & Worcester is not a direct competitor of the Boston & Maine but rather carries north-south traffic that originates on the Boston & Maine to Connecticut and Rhode Island. Providence & Worcester opposed the merger on the grounds that the merged railroad would not be financially viable and would be unable to maintain current service over those Boston & Maine lines that connect with the Providence & Worcester.

### 2. The ICC's Decision

The ICC approved the merger and denied all requests for protective conditions. It found that the "quintessential public benefit" from the merger was "the emergence of the [Boston & Maine] from reorganization as part of a potentially strong unified rail network." *Boston & Maine Merger,* 366 I.C.C. at 336. The Commission also found that "[t]he primary competitive impacts of the [merger] are favorable." *Id.* at 340. There would be no direct reduction of competition because the Boston & Maine

and the Maine Central "meet end-to-end" and "do not operate any parallel lines." *Id.* at 341. In addition, the combined Maine Central/Boston & Maine would be a stronger competitor against "the Canadian lines and Conrail." *Id.*

The ICC further found that the merger would not lead to cessation of essential services. The Commission rejected Canadian National's request for protective conditions on traffic interchanges at Danville and Yarmouth Junctions for several reasons. In particular, it was not convinced that Guilford intended to delay interchanges. Also, Canadian National's "ratemaking flexibility" gave it "sufficient competitive leverage to adequately combat any possible diversions of traffic." *Id.* at 352.

As for Lamoille Valley's request to buy track from the Boston & Maine, the ICC agreed that the diversion of much of Lamoille Valley's overhead traffic to the Boston & Maine would be a "devastating" financial blow to Lamoille Valley. *Id.* at 353. Nevertheless, it rejected Lamoille Valley's request because Lamoille Valley's service was not "essential"—shippers could use truck transportation instead. While truck transportation was more expensive than rail transportation, it was not so expensive that shippers would be "forced out of business." *Id.*

### E. Issues Presented

Lamoille Valley, supported by intervenors Eastern Magnesia Talc Co. (a shipper that uses the Lamoille Valley) and State of Vermont, claims that the ICC's test for whether a rail line provides "essential services"— will shippers go out of business if the line shuts down—is too strict and does not comport with the statutory directive that the ICC consider "adequacy of transportation to the public." 49 U.S.C. § 11,344(b)(1)(A). Lamoille Valley also claims that the Com-

---

**10.** Canadian National's co-petitioners—Central Vermont Railway, Grand Trunk Western Railroad, and Detroit, Toledo & Ironton Railroad— are wholly-owned subsidiaries of Canadian National. We use the name "Canadian National" to refer to any and all of these railroads.

**11.** Canadian Pacific, the other principal competitor of the Boston & Maine, also sought protective conditions before the ICC and petitioned this court for review, but later made its separate peace with Guilford and withdrew its petition for review.

mission erred in not requiring Timothy Mellon, the sole owner of Guilford, to join the merger application and in failing to consider the interests of Lamoille Valley employees who may lose their jobs as a result of the merger.

Canadian National joins Lamoille Valley in arguing that the ICC's essential services test is too strict. It also charges that the Commission misanalyzed both Guilford's incentive to delay interchanges at Danville and Yarmouth Junctions and the effect of such an action on Canadian National's willingness to remain in competition with the Boston & Maine. Finally, Canadian National argues that the expedited procedural schedule used by the ICC in considering the merger was a "rule" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551(4), 553, and was improperly issued without notice and comment.

Providence & Worcester joins Lamoille Valley in objecting to the ICC's failure to require Timothy Mellon to join the control application. In addition, it objects to the Commission's finding that the Boston & Maine would be financially viable after the merger. Finally, Providence & Worcester raises several procedural objections: the ICC improperly failed to exercise jurisdiction over Guilford's issuance of securities to Timothy Mellon in connection with the merger; the ICC erred in approving Guilford's acquisition of the Vermont & Massachusetts Co. (which owns a single 56-mile long rail line leased by the Boston & Maine under a 999-year lease) without requiring a formal control application; and the ICC allowed Guilford prematurely to control the Boston & Maine.[12]

Intervenors Guilford and Trustees of the Boston & Maine support the ICC's decision.

In part II of this opinion, we defer, under principles of equitable abstention, to the reorganization court's finding that the merged Boston & Maine will be financially viable, and conclude that the ICC properly approved the merger as a whole. In part III, we find that the ICC's "essential services" test for determining when protective conditions may be needed, *on its face*, complies with the statute. Nevertheless, we find that the test, *as applied* to Lamoille Valley, is too strict. In part IV, we find that the ICC failed adequately to explain why Guilford would not downgrade service at Danville and Yarmouth Junctions and that the Commission placed undue weight on Canadian National's system-wide revenues in assessing Canadian National's willingness to provide service to Maine. In part V, we conclude that the ICC properly declined to take into account the interests of Lamoille Valley's employees in continued employment.

Part VI deals with the procedural issues. We conclude that the ICC's failure to require Timothy Mellon to join the merger application, if error, is not prejudicial in this case. We further conclude that the expedited procedural schedule used by the ICC is exempt from the APA's notice and comment requirements as a "rule[ ] of agency ... procedure," 5 U.S.C. § 553(b)(A), and that Providence & Worcester's various procedural objections are without merit. Part VII is a conclusion.

## II. The Financial Viability of the Boston & Maine

The ICC has a statutory responsibility to decide both whether the merger of the Maine Central with the Boston & Maine is

---

12. The Boston & Maine Trustees argue that Providence & Worcester's alleged injury from the merger—downgrading of the Boston & Maine's service connecting with the Providence & Worcester—is too speculative to satisfy the "injury in fact" requirement for standing. *See Control Data Corp. v. Baldrige,* 655 F.2d 283, 288–89 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981) (3-part test for standing under the APA). We agree that the asserted injury is less than certain to occur.

We note, however, that the ICC must have thought Providence & Worcester's objections were substantial enough to warrant addressing them on the merits. We shall do likewise. We defer to the ICC's expert judgment that there was a real possibility of harm to Providence & Worcester from an unconditioned merger. (An agency's assessment that the probability of injury from the agency's action is too low to confer standing would present a different case that we need not address here.)

"consistent with the public interest" under the Interstate Commerce Act, 49 U.S.C. § 11,344(c), and whether the reorganization of the Boston & Maine is "compatible with the public interest" under Bankruptcy Act § 77(d), 11 U.S.C. § 205(d) (1976) (current version at 11 U.S.C. § 1172). As part of its "public interest" determination under the Bankruptcy Act, the Commission found that the merged Boston & Maine would be financially viable. *Boston & Maine Merger,* 366 I.C.C. at 310–13. Finding that the other requirements of Bankruptcy Act § 77 were also satisfied, the Commission certified the reorganization plan to the reorganization court. *Id.* at 318. The reorganization court agreed that the merged Boston & Maine would be viable and approved the plan. *In re Boston & Maine Corp.,* No. 70–250–M, mem. op. at 33–42 (D.Mass. opinion issued Feb. 23, 1983), *appeal filed,* No. 83–1086 (1st Cir. Feb. 3, 1983).

In considering whether the merger was "consistent with the public interest" under Interstate Commerce Act § 11,344(c), the ICC saw "no need to repeat" its analysis of the viability of the reorganization plan. Relying on that analysis, the Commission again found that the merged Boston & Maine would be financially viable. *Boston & Maine Merger,* 366 I.C.C. at 339.

Providence & Worcester claims that the ICC wrongly decided that the reorganized and merged Boston & Maine would be financially viable.[13] The ICC and the Boston & Maine Trustees respond that we lack jurisdiction to review the Commission's finding of viability because review of that finding lies exclusively in the reorganization court.[14] We agree with this response, though we would characterize the issue as one of equitable abstention rather than lack of jurisdiction.

The *New Haven Inclusion Cases,* 399 U.S. 392, 419–30, 90 S.Ct. 2054, 2072, 2077–2078, 26 L.Ed.2d 691 (1970), involved a situation similar to this one. The ICC had approved the merger of the bankrupt New Haven Railroad with the Penn Central Railroad.

The parties appealed the Commission's valuation of the New Haven's assets both to a three-judge district court with jurisdiction to review the ICC's approval of the merger and to the reorganization court charged with reviewing the New Haven's reorganization plan. The two courts reached conflicting valuations. The Supreme Court held that the three-judge district court, although it had jurisdiction "in a technical sense," *id.* at 427, 90 S.Ct. at 2076 should have "stayed its hand" and permitted the reorganization court to decide the valuation question, *id.* at 428, 90 S.Ct. at 2076–2077.

We think abstention is likewise called for here. To be sure, in the *New Haven Inclusion Cases,* valuation was the sole issue still to be decided, so that the two courts were considering "identical issues." *Id.* at 428, 90 S.Ct. at 2076–2077. Here, in contrast, we must decide numerous issues under the Interstate Commerce Act that were not and could not have been presented to the reorganization court. But the policy considerations that led the Court to order abstention in the *New Haven Inclusion Cases* also counsel abstention here.

First, the standard for determining financial viability is the same under the Bankruptcy Act and the Interstate Commerce Act. Thus, there is "no danger that application of [Bankruptcy Act § 77] would yield results different from those to be produced by [Interstate Commerce Act § 11,344(c)]." *Id.* at 424, 90 S.Ct. at 2075. Second, for this court to decide an issue that the reorganization court must also decide " 'would tend greatly to foment conflicts between coordinate courts and compel creditors, in the protection of their interests, to ride the circuit, demonstrating the basis of their positions in successive courts.' " *Id.* at 427, 90 S.Ct. at 2076 (quoting *In re New York, N.H. & H.R. Co.,* 26 F.Supp. 18, 23 (D.Conn.), *aff'd sub nom. Palmer v. Warren,* 108 F.2d 164 (2d Cir.1939), *aff'd,* 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (1940)).

---

**13.** Providence & Worcester Brief at 42–47; Providence & Worcester Reply Brief at 19–24.

**14.** ICC Brief at 87 & n. 59; Boston & Maine Trustees Brief at 37–40.

Third, Providence & Worcester has already had a full opportunity to present its arguments to the reorganization court, which rejected them. Thus, it cannot complain of unfairness because we do not give it a second bite at the apple. *Cf. id.* 399 U.S. at 428 n. 57, 90 S.Ct. at 2077 ("At no time has anyone questioned Penn Central's status as a party litigant in the reorganization court or challenged its right to make a full presentation of its case there . . . .").[15]

Finally, the major policy reason counseling against abstention—"the importance of an expedited determination of the merits," *id.* at 424, 90 S.Ct. at 2074—is not a factor in this case since the reorganization court has already issued its decision.

For the foregoing reasons, we defer to the reorganization court's conclusion that the ICC properly found that the merged Boston & Maine would be financially viable. The parties raise no other objection to the substantive basis for the ICC's approval of the merger as a whole, and we find in part VI *infra* no basis for reversing the Commission on procedural grounds. We therefore affirm the Commission's decision that the merger is "consistent with the public interest." 49 U.S.C. § 11,344(c).

## III. LAMOILLE VALLEY'S REQUEST FOR PROTECTIVE CONDITIONS

### A. *Standard of Review*

■ The standard of review for the ICC's decision is well established. The Commission's interpretation of its governing statute, like that of any regulatory agency, is "entitled to deference." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). We must accept the Commission's interpretation if it is "sufficiently reasonable," even if it is not "the only reasonable one or even the reading the court would have reached" on its own. *Id.* at 39, 102 S.Ct. at 46; *see Nation-*

*al Wildlife Federation v. Gorsuch,* 693 F.2d 156, 166–71 (D.C.Cir.1982).

■ The ICC's substantive conclusions are subject to review under the "substantial evidence" test of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). *See Illinois Central Railroad v. Norfolk & Western Railway,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966). Under that test, the Commission's factual findings must be supported by enough evidence "to justify . . . a refusal to direct a verdict" the other way in a case tried to a jury. *Id.* We also expect that when the facts are uncertain, the agency will "so state and go on to identify the considerations [it] found persuasive." *Industrial Union Department, AFL–CIO v. Hodgson,* 499 F.2d 467, 476 (D.C.Cir.1974). Moreover, the Commission must "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, ——, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437 (1983); *see Sierra Club v. Costle,* 657 F.2d 298, 323 (D.C.Cir.1981).

■ Having assured ourselves that the agency has fully considered an issue and given reasons for its conclusions, we have only limited power to second-guess those reasons. "We can and do insist that the agency's reasons and policy choices do 'not deviate from or ignore the ascertainable legislative intent.'" *Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency,* 705 F.2d 506, 520 (D.C.Cir.1983) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). Beyond that, however, "[i]t is not for the court to strike down conclusions that are reasonably drawn from the evidence and findings in the case." *Illinois Central,* 385 U.S. at 69, 87 S.Ct. at 262; *see*

---

**15.** The reorganization court found that Providence & Worcester lacked standing to object to the plan of reorganization. *In re Boston & Maine Corp., supra* note 9, mem. op. at 34.

Nevertheless, the court went on to reject Providence & Worcester's claim on the merits. *Id.* at 34–42.

*Seaboard Coast Line Railroad v. United States,* 599 F.2d 650, 652 (5th Cir.1979).

### B. The ICC's Decision

The Lamoille Valley operates a single 98-mile-long east-west line between St. Johnsbury, Vt. in the east (where it connects with the Maine Central) and Swanton, Vt. in the west (where it connects with the Canadian National). It depends for financial viability on "overhead" traffic which it carries from the Maine Central to the Canadian National or vice-versa. The merger of the Maine Central with the Boston & Maine gives Guilford an incentive to divert traffic from the Maine Central/Lamoille Valley/Canadian National line to the competing Maine Central/Boston & Maine line.[16]

Guilford estimated that its diversion efforts would reduce Lamoille Valley's gross revenues by about $180,000, based on 1980 traffic data. *See Boston & Maine Merger* app. C, 366 I.C.C. at 370. Lamoille Valley challenged Guilford's assumptions and counterestimated traffic diversion of as much as $300,000.[17] The ICC found flaws in Guilford's analysis and concluded that Guilford's diversion estimates—both for the Lamoille Valley and for other carriers— "are understated and can be considered as bare minimum estimates of traffic and revenue diversions." *Id.* at 372.

For the Lamoille Valley, the ICC found it unnecessary to make its own estimate of traffic diversion. It concluded that "[e]ven using [Guilford's] figures, which we have found to be minimum estimates, [Lamoille Valley] stands to lose ... over 15 percent of its 1980 gross revenue. Such a financial blow would be devastating to [Lamoille Valley]." *Id.* at 353.

Despite this bleak outlook, the ICC denied Lamoille Valley's request for protective conditions because Lamoille Valley's services were not "essential." Lamoille Valley's overhead service was not essential "since a number of other connections to the Canadian routes exist." *Id.* at 354. Moreover, trucks could substitute for Lamoille Valley's local service. While truck service would undeniably cost more, shippers sometimes used trucks even now and no shippers would be "forced out of business" if they had to rely exclusively on trucks:

> Even assuming that ... there would be a cessation of operations, we cannot conclude that essential services would be affected. It appears from the evidence presented by shippers ... that they can be served by motor carriers. All three supporting shippers ... are either presently being served in part, or have been served previously, by truck.... While motor carrier service is more costly, it is a reasonably adequate substitute for [rail] service. None of the supporting shippers has indicated that it would be forced out of business if [Lamoille Valley] discontinued service.[43]
>
> [43] ... Eastern Magnesia Talc Company notes that costs of motor carrier transportation are "prohibitively expensive," but does not add that operations would be terminated.

*Id.* at 353.

Relying on this passage, Lamoille Valley asserts that the Commission used a "business termination" test to determine if Lamoille Valley's local service was "essential," and that this test does not comply with the statutory directive that the ICC consider "adequacy" of transportation. 49 U.S.C. § 11,344(b)(1)(A).[18] Lamoille Valley also claims that the ICC failed to analyze the reduction in competition for east-west traffic from the Lamoille Valley going out of business. ICC counsel replies that the Commission, in finding that Lamoille Valley's

---

**16.** Guilford's subsequent acquisition of the Delaware & Hudson, which we approve today in *Central Vt. Ry. v. ICC,* 711 F.2d 331 (D.C.Cir. 1983), extends the Boston & Maine's east-west route further west and thus increases Guilford's incentive to divert traffic from the Maine Central/Lamoille Valley/Canadian National route to the Maine Central/Boston & Maine/Delaware & Hudson route.

**17.** *See* Verified Statement of Edward Lewis, General Manager of Lamoille Valley Railroad, at 12 (Jan. 6, 1982), *reprinted in* Joint Appendix (J.A.) at 1690, 1701.

**18.** Lamoille Valley Brief at 8–30; Lamoille Valley Reply Brief at 1–9.

services were not "essential," relied solely on the fact that the shippers were now or recently had been served by truck. Counsel asserts that the Commission has "never adopted or recommended" a business termination test and that the Commission's reference to shippers being "forced out of business" was mere dictum.[19] As for possible reduction in competition from the Lamoille Valley going out of business, the Commission evaluated it and found it to be negligible.

## C. *The Essential Services Test*

█ The ICC's policy statement on railroad mergers explains that there are "two potential results from consolidations which would ill serve the public—reduction of competition and harm to essential services." 49 C.F.R. § 1180.1(c)(2) (1982). The Commission defines "essential services" as:

> A service is essential if there is a sufficient public need for the service and adequate alternative transportation is not available.

*Id.* § 1180.1(c)(2)(ii). The ICC treats the existence of harm to competition or to essential services as a *threshold* test for when

conditions *may* be needed to reduce the adverse effects of a merger. It will never impose protective conditions unless a merger will cause significant reduction in competition or harm to essential services. If a merger will reduce competition or harm essential services, the Commission will decide whether conditions are desirable by balancing the costs and benefits of imposing conditions. This subsection considers the ICC's use of conditions to protect essential services; subsection D considers the ICC's use of conditions to preserve competition.

In general, the ICC's use of the "essential services" test as a threshold test for when protective conditions deserve further consideration is unobjectionable. Leaving aside the requirement—not at issue in this case[20]—of a "sufficient public need," the ICC defines an "essential service" as one for which an "adequate alternative ... is not available." This definition simply restates the statutory requirement that the ICC consider "adequacy of transportation to the public." 49 U.S.C. § 11,344(b)(1)(A).[21] *Accord Brotherhood of Maintenance of Way*

---

**19.** ICC Brief at 46–47. ICC counsel also asserts that the Commission "was unconvinced that the potential revenue diversions . . . would put [Lamoille Valley] out of business." *Id.* at 42. Counsel relies on the ICC's speculation whether "the State of Vermont would walk away from its substantial investment in [Lamoille Valley]" and whether the Lamoille Valley's "excessive dependence on revenue from overhead traffic" might indicate "unrealistically low" rates for local traffic, in which case the Lamoille Valley could raise its local rates to offset lost revenues from overhead traffic. *Boston & Maine Merger,* 366 I.C.C. at 353–54.

We think that these comments by the ICC, read in context, are dicta. Moreover, the Commission's speculations are not, so far as we can tell, based on any evidence in the record. Thus, if we believe that this line of reasoning was critical to the ICC's decision, we would remand to the Commission for lack of substantial evidence to support its conclusion that the Lamoille Valley would continue operating.

**20.** Guilford asserts that Lamoille Valley failed to show a "sufficient public need" for its service. Guilford Brief at 14–18. The ICC, however, did not refer in its decision to the "sufficient public need" requirement. Thus, the

meaning of that phrase is not at issue in this case, and we express no view on how the Commission may permissibly interpret it.

**21.** The ICC also explained the close connection between the statutory standard of "adequacy of transportation to the public" and the essential services test in its decision in this case. *See Boston & Maine Merger,* 366 I.C.C. at 348 ("the issue of whether conditions should be applied in a consolidation ... goes essentially to the question of whether the transaction will result in a lessening of the adequacy of transportation to the public").

The ICC has repeated this statement in almost all of its recent merger decisions. See Union Pac. Corp.—Control—Missouri Pac. Corp., 366 I.C.C. 459, 562 (1982), *appeal filed sub nom. Southern Pac. Transp. Co. v. ICC,* No. 82–2253 (D.C.Cir. argued June 6, 1983); *Delaware & Hudson Merger, supra* note 1, 366 I.C.C. at 412; Norfolk S. Corp.—Control—Norfolk & W. Ry., 366 I.C.C. 171, 235 (1982); CSX Corp.—Control—Chessie Sys., 363 I.C.C. 518, 577 (1980), *aff'd sub nom. Brotherhood of Maintenance of Way Employees v. ICC,* 698 F.2d 315 (7th Cir.1983); St. Louis Sw. Ry.— Purchase (Portion)—Chicago, Rock Island & Pac. R.R., 363 I.C.C. 320, 380 (1980).

*Employees v. ICC,* 698 F.2d 315, 319 n. 14 (7th Cir.1983) ("Essential services are basically those the deprivation of which would result in inadequate service to the public."); *cf. Missouri-Kansas-Texas Railroad v. United States,* 632 F.2d 392, 400–04 (5th Cir. 1980) (approving the ICC's use of an earlier definition of "essential services"), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).

It remains to consider whether the ICC properly applied the essential services test to Lamoille Valley. The ICC gave three reasons for concluding that there were adequate alternatives to Lamoille Valley's rail service. First, all three shippers who testified in favor of Lamoille Valley's request for protective conditions "are either presently being served in part, or have been served previously, by truck." Furthermore, one shipper, E.T. & H.K. Ide Co., "has access to [Canadian Pacific] rail in St. Johnsbury, [Vt.]" Finally, no shipper claimed that "it would be forced out of business if [Lamoille Valley] discontinued service." *Boston & Maine Merger,* 366 I.C.C. at 353.

### 1. *Current or Past Truck Service*

The Commission's first reason for believing that Lamoille Valley's service is not essential has some probative force. It is plausible that a shipper formerly served by truck can again use trucks and that a shipper now served partially by truck can adequately be served entirely by truck. We must still determine, however, whether the record supports the Commission's belief that the individual shippers now served by the Lamoille Valley can be adequately served by truck.

We pass quickly over the one shipper, E.T. & H.K. Ide Co., which has access to Canadian Pacific's rail service, for that service is surely an adequate substitute for Lamoille Valley's service. For a second

shipper, Lamoille Grain, the record shows that the price difference between rail and truck service is small. Indeed, as recently as 1980, Lamoille Grain switched from rail to truck because truck rates were slightly lower. It switched back only after Lamoille Valley reduced its rates to make them competitive with truck rates.[22] Thus, Lamoille Grain can be served adequately by truck.

The third shipper, Eastern Magnesia Talc Co., presents a much harder case. It operates a talc mine from which it ships talc by truck to some nearby locations and by rail (usually 100-ton hopper cars) to more distant locations. Eastern Magnesia Talc explained to the ICC that the cost of "loading to truck, hauling to a [railhead], unloading, ... and loading to railroad cars" would be "prohibitively expensive" and would effectively prevent it from serving distant locations.[23]

In light of Eastern Magnesia Talc's uncontradicted statement about the need for rail service for a substantial part of its business, the Commission could not reasonably conclude that because Eastern Magnesia Talc uses trucks for part of its business, trucks are an adequate substitute for rail for the remainder of its business. We turn therefore to the Commission's alternate reason for concluding that Eastern Magnesia Talc could switch to truck service—that Eastern Magnesia Talc had not asserted that it would be "forced out of business" if it loses rail service.

### 2. *Business Termination*

As an initial matter, and despite Commission counsel's denial, it seems clear to us that the ICC is indeed using a "business termination" test to determine whether a substitute for rail service is "adequate." The ICC's explanation, though terse, is unambiguous:

> Magnesia Talc's asserted need for rail service is given added credibility by its purchase in 1977 of a 26% interest in the Lamoille Valley. *See* Lamoille Valley Brief at ii; Eastern Magnesia Talc Brief at 3.

---

22. *See* Verified Statement of Kenneth Gilman, co-owner of Lamoille Grain Co., at 1 (Jan. 7, 1982), J.A. at 1718, 1718.

23. Verified Statement of J. Howard Shafer, General Manager, Eastern Magnesia Talc Co., at 2 (Jan. 8, 1982), J.A. at 1720, 1721. Eastern

While motor carrier service is more costly, it is a reasonably adequate substitute for [rail] service. None of the supporting shippers has indicated that it would be forced out of business if [Lamoille Valley] discontinued service.

*Boston & Maine Merger,* 366 I.C.C. at 353 (footnote omitted). Similarly, in approving Guilford's acquisition of the Delaware & Hudson, the ICC explained that the north-south service provided by Canadian National was not essential because, in part:

Nowhere in the record has it been shown that any of [its] customers would go out of business if [Canadian National's] rail service would be terminated.

*Delaware & Hudson Merger, supra* note 1, 366 I.C.C. at 420. The ICC has used similar phraseology in several recent cases approving abandonment of rail service. *See, e.g., Missouri Pacific Railroad—Abandonment— Between Port Barre & Jefferson Island,* Docket No. AB–3 (Sub-No. 27), slip op. at 5 (July 21, 1982) (not printed) (protesting shipper did "not contend that the loss of rail service would put it out of business").[24]

We can find no justification in the statute for use of a "business termination" test to determine whether alternative service is adequate, and indeed neither the ICC nor Guilford offers any.[25] The legislative history does not explain what Congress meant when it instructed the ICC to consider "adequacy of transportation to the public."[26] Thus, we must give the word "adequate" its ordinary meaning.

A refusal to consider protective conditions unless alternative service is so expensive that shippers will be forced out of business does not comport with the statutory directive to take into account "adequacy" of transportation. The term "adequate," as the Supreme Court noted long ago in a similar context, is "a relative expression." *Atlantic Coast Line Railroad v. Wharton,* 207 U.S. 328, 335 (1907). For a shipper, loss of a service that it currently uses generally portends *some* decrease in profit, which can be anywhere from minor to devastating. If the additional cost involved in using an alternative service is small, the ICC need not be concerned. At the other extreme, if the added cost is so grave as to force bankruptcy, the alternate service is clearly inadequate, at least for that shipper. Somewhere between these two extremes, we pass from adequate to inadequate service. Within reason, the Commission has discretion to draw the dividing line as it sees fit. The business termination test, however, is too far to one extreme to be a reasonable definition of "adequacy."

In seeking on remand to draw a better line, the Commission should inquire into how much more costly a proposed alternative is and whether loss of existing service will cause substantial harm to the local economy or to shippers who now use that service. With regard to individual shippers, if a shipper can use alternate service and still earn a fair return on capital, sufficient to generally maintain current operations and justify reinvestment of earnings, the

---

**24.** *See also* Illinois Cent. Gulf R.R.—Abandonment—Between Milepost 0.0 at Cherokee & Milepost 96.47 at Sioux Falls, Docket No. AB–43 (Sub-No. 47), slip op. at 22 (Jan. 18, 1983) (not printed) ("Calumet [a shipper] admits that it will continue to survive if abandonment is authorized."); Louisville & Nashville R.R.—Abandonment—In Fannin County, Docket No. AB–2 (Sub-No. 38), slip op. at 7 (Sept. 10, 1982) (not printed) ("[A]bandonment of the Murphy Branch would not leave [shippers] *entirely* without an alternative means of distributing their products.... [M]otor carriage ... is not *so inadequate* as to burden shippers with *insurmountable* transportation problems.") (emphasis added), *rev'd sub nom. Georgia Pub. Serv. Comm'n v. United States,* 704 F.2d 538 (11th Cir.1983).

**25.** Guilford, like ICC counsel, denies that the Commission is using a business termination test. *See* Guilford Brief at 16–17.

**26.** The Transportation Act of 1940, Pub.L.No. 76–785, sec. 7, § 5(2)(c)(1), 54 Stat. 898, 906, added the requirement that the ICC consider the effect of a merger "upon adequate transportation service to the public." This requirement has been carried forward without substantive change in the current law. The relevant committee reports do not explain what Congress meant by "adequate transportation." *See* H.R.Rep. No. 1217, 76th Cong., 1st Sess. 12 (1939); H.R. Rep. No. 2832 (Conf.Rep.), 76th Cong., 3d Sess. 68–69 (1940).

alternate service would seem adequate. The same is true if the shipper can switch production to another plant without serious harm to the local economy. On the other hand, if a shipper cannot earn a fair return, or can do so only by sharply curtailing operations, the Commission probably ought to inquire further into the desirability of protective conditions. It is worth stressing that the essential services test is not a test for *imposing* conditions, but a test for when it is worthwhile to *consider* doing so. The ICC may do well, in close cases, to err on the side of reaching the merits of the underlying question whether protective conditions are in the public interest.

Sometimes, the profitability of individual shippers may be hard to assess, or a railroad may serve a large number of small shippers, insignificant individually but important in aggregate. The Commission may then want to consider whether most shippers in a particular industry rely on rail service. If not, that suggests that alternate transportation is probably an adequate substitute for shippers in that industry. If most shippers do rely on rail service, then alternate service is probably not an adequate substitute.

The Commission will also need to assess the importance of individual shippers. If the major shipper or shippers on a rail line can switch to truck, the Commission can reasonably find that truck service is ade-quate even if a few minor shippers cannot switch. Conversely, alternate service may be inadequate if a major shipper whose facility is important to the local economy cannot switch, even if most shippers can use the alternate service. Again, we urge the Commission, in cases of doubt, to proceed beyond the threshold "essential services" stage of its inquiry.

We note that our interpretation of "adequacy" of alternative transportation as meaning more than just not going out of business is consistent with past ICC interpretations. While there is no useful case law involving protective conditions for mergers (until recently, the ICC imposed a set of standard conditions on virtually every rail merger [27]), abandonment cases provide a close analogy.[28] The abandonment cases do not define "adequacy," but they do show that the ICC, in determining the public need for rail service, has inquired into the relative costs of rail and truck service. For example, in *Northwestern Pacific Railroad Abandonment (Portion) Sausalito Branch,* 312 I.C.C. 783, 789 (1962), the Commission found that abandonment was not warranted even though most of the shippers objecting to the abandonment "use motortrucks for part of their shipments." The Commission noted that a distiller "would be handicapped by the narrowing of the area in which it could purchase raw materials"; a dealer in heavy diesel engines would incur "added expense" in shipping disassembled

---

27. These protective conditions required a merging carrier to keep open and maintain current service on all existing joint routes with competing carriers. They were called "DT & I Conditions" after the case in which they were first standardized. Detroit, Toledo & Ironton R.R. Control, 275 I.C.C. 455, 492–93 (1950), aff'd sub nom. *New York, C. & St. L.R. Co. v. United States,* 95 F.Supp. 811 (N.D.Ohio 1951) (3-judge court). The Commission imposed the DT & I Conditions on all mergers until 1979, when it declined to impose conditions in Norfolk & W. Ry.—Control—Detroit, Toledo & Ironton R.R., 360 I.C.C. 498, 526–27 (1979), aff'd in part & remanded in part sub nom. *Norfolk & W. Ry. v. United States,* 639 F.2d 1096 (4th Cir.1981). The ICC has since concluded that the DT & I Conditions "are anticompetitive and contrary to the public interest." *Rulemaking Concerning Traffic Protective Conditions in Railroad Consolidation Proceedings,* 366 I.C.C. 112, 112 (1982), *appeal filed sub nom. Detroit, Toledo & Ironton R.R. v. United States,* No. 82–3251 (6th Cir. argued Oct. 27, 1982).

28. Lamoille Valley also cites a number of cases involving proposed *additional* service which suggest that a minor improvement in quality of service is enough to make existing service inadequate. *E.g., Pennsylvania R.R. v. United States,* 323 U.S. 588, 591–93, 65 S.Ct. 543, 544–545, 89 L.Ed. 478 (1945); *Denver & Rio Grande W.R.R. v. Union Pac. R.R.,* 351 U.S. 321, 333–34, 76 S.Ct. 982, 988–989, 100 L.Ed. 1220 (1956). We find these cases of little precedential value. The Commission can reasonably use one standard of adequacy when considering whether to authorize new entry into a market and a different standard in considering whether to allow market forces to dictate the loss of all rail service to an area.

engines by truck and assembling them at destination; and a sailboat manufacturer would incur "40 to 50 percent higher [costs]" in shipping sailboats by truck. *Id.* The Commission did not insist that the affected shippers claim they would be forced out of business by loss of rail service.[29]

Recent court decisions are in accord. *See Georgia Public Service Commission v. United States,* 704 F.2d 538, 545 (11th Cir.1983) (reversing ICC approval of a rail abandonment):

> The uncontroverted testimony ... is that ... the "additional" transportation costs [of truck service] would be prohibitive .... If the phrase "alternative [transportation]" is to have any meaning it must be interpreted to include transportation both logistically and economically feasible.

*See also Indiana Sugars, Inc. v. ICC,* 694 F.2d 1098, 1101 (7th Cir.1982) (abandonment would "inflict serious hardships" on sugar company that depended on rail for much of its inbound traffic).

**29.** *See also* Baltimore & Ohio R.R. Abandonment, Landenburg Branch, 354 I.C.C. 67, 72 (1977) (disapproving abandonment because of the "serious, adverse effects" on shippers; one major shipper would have to spend a substantial annual sum to ship by truck to the nearest railroad); Norfolk S. Ry. Abandonment, 282 I.C.C. 622, 625 (1952) (denying abandonment and noting that although affected peach growers could use trucks, "[p]eaches shipped by rail are salable longer ... and they reach more distant markets").

**30.** The Commission did not reach the question whether the conditions requested by Lamoille Valley are in the public interest, but we have grave doubts whether they are. Essentially, Lamoille Valley has asked the Commission to award it a new and profitable route so that it can use the profits to subsidize losses on its existing route. That request appears to violate the Commission's policy against "subsidiz[ing] carriers who are no longer able to compete efficiently in the marketplace." 49 C.F.R. § 1180.1(d)(1) (1982) (quoted in full in note 8 *supra*). We cannot say that this policy is unreasonable in light of the congressional directive in the Staggers Rail Act, 49 U.S.C. § 10,101a(5), to "foster sound economic conditions in transportation." *Accord Brotherhood of Maintenance of Way Employees v. ICC,* 698

### 3. *Conclusion*

We conclude that the ICC misconstrued its governing statute and failed to justify its belief that Eastern Magnesia Talc can be served adequately by trucks. Therefore, we remand to the ICC to reconsider Eastern Magnesia Talc's ability to switch to trucks. If Eastern Magnesia Talc cannot switch, the Commission will also need to consider two questions this opinion does not address—whether the needs of a single shipper make Lamoille Valley's service essential and, if so, whether the protective conditions sought by Lamoille Valley are in the public interest.[30] We order as follows: As discussed in part II *supra,* the merger as a whole is approved, but the ICC shall expeditiously consider whether it is in the public interest to impose protective conditions in order to preserve the Lamoille Valley's service.[31]

### D. *Anticompetitive Effect*

In reviewing a merger, the ICC must consider not only adequacy of transportation but also "whether the proposed

F.2d 315, 319 (7th Cir.1983) ("establishment of the 'procompetitive' policy disfavoring [protective] conditions falls squarely within the discretion of the Commission in exercising its regulatory expertise").

Nevertheless, it is not our place to decide what the ICC will do. Moreover, the ICC has the authority to impose conditions other than those initially suggested by Lamoille Valley. *See* notes 54–55 *infra* and accompanying text.

**31.** In light of this disposition, we do not reach Lamoille Valley's claim that even if the ICC may use a "business termination" test to measure the adequacy of alternate service, such a test is a major departure from prior policy for which the Commission failed to give a reasoned explanation. *See Missouri-Kan.-Tex. R.R. v. United States,* 632 F.2d 392, 403 (5th Cir.1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). We likewise do not reach Lamoille Valley's claim that the Commission did not give Lamoille Valley advance notice of the new test. *See Norfolk & W. Ry. v. United States,* 639 F.2d 1096, 1099 (4th Cir.1981). Finally, we do not need to reach Lamoille Valley's challenge to the adequacy of Guilford's study of traffic diversion in light of the Commission's conclusion that, even using Guilford's diversion estimates, Lamoille Valley would suffer "devastating" revenue losses.

transaction would have an adverse effect on competition among rail carriers in the affected region." 49 U.S.C. § 11,344(b)(1)(E). The ICC found that the Maine Central and the Boston & Maine "do not operate any parallel lines, but meet end-to-end." *Boston & Maine Merger,* 366 I.C.C. at 341. Therefore, the merger would not "directly reduce" competition, except for a minor impact on shippers in Portland, Maine (where the two rail systems meet). *Id.* The Commission found that, on the contrary, by strengthening the Boston & Maine, the merger would enhance competition for east-west traffic between the Boston & Maine route and the currently dominant Canadian National and Canadian Pacific routes. *Id.* at 340–41.

The Commission recognized that "[a]n end-to-end consolidation may allow the [combined] system to divert traffic from remaining competitors and thereby foreclose their opportunity to compete in the marketplace." *Id.* at 341 n. 35. It concluded, however, that the possible demise of the Lamoille Valley would have "negligible" competitive impact because "a number of other connections to the Canadian routes exist." *Id.* at 354.

Lamoille Valley asserts that the Maine Central does in fact compete with the Boston & Maine for east-west traffic.[32] We agree. Traffic from Maine can travel west over four routes: (1) over the Canadian National (which connects with the Maine Central at Danville and Yarmouth Junctions, Maine) to Montreal and points west; (2) over the Maine Central's Mountain Division line to St. Johnsbury, Vt., and from there over the Lamoille Valley to the Canadian National to Montreal and points west; (3) over the Maine Central's Mountain Division line to St. Johnsbury and from there over the Canadian Pacific to Montreal and points west; and (4) over the Boston &

Maine to Albany and points west. Thus, the Maine Central's Mountain Division line competes with the Boston & Maine's east-west line.

At present, the Maine Central has an incentive to route traffic over its own long haul (routes 2 and 3), in preference to the Canadian National route or the Boston & Maine route. After the merger, Guilford will prefer to route traffic to its new long haul—the Boston & Maine route—in preference to the other three routes. This traffic shift will lead to the Boston & Maine gaining revenue ($3.2 million annually according to Guilford's traffic study) while the Maine Central loses revenue ($1.9 million annually according to Guilford's study) due to decreased traffic over its Mountain Division line. *See Boston & Maine Merger* app. C, 366 I.C.C. at 370. We must therefore reject the ICC's statement that the Maine Central and the Boston & Maine do not compete with each other.[33]

Nevertheless, we believe that the record supports the ICC's belief that the "primary competitive impacts of the [merger] are favorable." *Id.* at 340. The east-west route from Maine to the Midwest is over 1000 miles long. Currently, the Canadian National and the Canadian Pacific are the dominant carriers. The Boston & Maine's more circuitous route provides minimal competition, especially given the Boston & Maine's sorry finances and the Maine Central's incentive to route traffic away from the Boston & Maine and onto its own Mountain Division line and thence to the Canadian carriers. The merger, the ICC found, will permit the Boston & Maine to compete effectively over a large portion of this route. For that benefit, decreased competition over the short distance traversed by

---

32. Lamoille Valley Brief at 41–44; Lamoille Valley Reply Brief at 9–13.

33. The ICC's assertion that the Maine Central and the Boston & Maine do not operate any "parallel lines" may be true in a narrow geometric sense, since the Maine Central's Mountain Division line (which carries traffic northwest) and the Boston & Maine's east-west line (which carries traffic southwest and then west) diverge at a 90° angle. The significant question, however, is whether the two lines compete for the same traffic, not whether they appear parallel on a map.

the Maine Central's Mountain Division line is a small price to pay.[34]

As for reduction in competition due to the demise of the Lamoille Valley, we note that a large number of competing carriers on a particular route is not an end in and of itself. Rather, competition is valuable because it promotes efficient service. We find reasonable the ICC's belief that the remaining competition among the Canadian National, the Canadian Pacific, and the Boston & Maine will provide sufficient stimulus for efficient operation of rail lines.

## IV. CANADIAN NATIONAL'S REQUEST FOR PROTECTIVE CONDITIONS

### A. The ICC's Decision

Canadian National carries freight from Danville and Yarmouth Junctions, Maine (where it connects with the Maine Central) west to Montreal and Chicago. The joint Maine Central/Canadian National line is the fastest route between Maine and Chicago.

The Canadian National's time advantage depends on close coordination of schedules and speedy interchange with the Maine Central at Danville and Yarmouth Junctions. Canadian National expressed concern to the ICC that after the merger, Guilford would refuse to cooperate with Canadian National on scheduling and inter-

changes, thus increasing transit time over the Maine Central/Canadian National route. This would lessen the attractiveness of that route and permit Guilford to divert more traffic to the currently slower Boston & Maine route. Canadian National also claimed that reduced traffic would force it to cut expenses by running fewer trains and reducing track maintenance, which would further increase transit time, which would lead to additional diversion of traffic to the Boston & Maine, which would force Canadian National to reduce service further, and so on in a vicious cycle that ultimately would lead Canadian National to abandon its Grand Trunk Eastern line between Maine and Montreal.[35]

Guilford's traffic study, which assumed no increase in interchange time at Danville and Yarmouth Junctions, predicted that diversion of east-west traffic to the Boston & Maine would cost Canadian National $2 million in annual revenues. Canadian National counterestimated diversion losses of $8.1 million per year if Guilford did not downgrade the Danville and Yarmouth interchanges and $12.5 million if Guilford did downgrade the interchanges.

Canadian National asked the ICC to require Guilford to maintain "present operating arrangements, schedules of service, [and] blocking and handling of freight traffic interchanged at [Danville and Yar-

---

**34.** There is also a problem with Lamoille Valley's requested relief. We do not see, and Lamoille Valley has not explained, how Lamoille Valley's purchase of some Boston & Maine track will cure the loss of competition between the Maine Central and the Boston & Maine. The Commission "will not impose" conditions on a merger because of anticompetitive effects unless the conditions "will ameliorate or eliminate the harmful effects." *Union Pacific—Control—Missouri Pacific, supra* note 21, 366 I.C.C. at 565. Thus, whatever the competitive harm from the Maine Central/Boston & Maine merger, Lamoille Valley would not seem to be entitled to the relief it seeks.

**35.** In addition to its east-west service, Canadian National operates joint north-south service with the Boston & Maine from Montreal to New York. Canadian National was concerned that Guilford would concentrate its efforts on east-west traffic and allow its north-south service to deteriorate. It therefore requested trackage rights over the Boston & Maine's por-

tion of the north-south line. The ICC denied this request as based on "unsubstantiated fears" of reduced service. *Boston & Maine Merger,* 366 I.C.C. at 352.

It is unclear whether Canadian National presses this request on appeal. It mentions the issue, *see* Canadian National Brief at 14–15, but advances no reasons why the ICC's decision is wrong. Assuming that the issue is before us, we conclude, for the reasons given in response to a similar claim in *Central Vermont Railway v. ICC, supra* note 1, 711 F.2d at 300, that any possible deterioration will not affect essential services.

Deterioration of the Boston & Maine's north-south service is also an essential component of Providence & Worcester's explanation of why it needs protective conditions. Since downgrading will not affect essential services, we affirm the Commission's denial of Providence & Worcester's request for conditions.

mouth] junctions." *Boston & Maine Merger* app. B, 366 I.C.C. at 365. It claimed that fast service to Chicago is "essential" to shippers and that these conditions were needed both to preserve that service and to preserve competition for east-west traffic between it and the Boston & Maine.[36]

In response, the ICC gave several reasons for believing that Canadian National's service would not be adversely affected by the merger. It did not reach the question whether that service is essential, nor did it discuss whether loss of the Canadian National's Grand Trunk Eastern line would significantly reduce competition for east-west traffic.

First, the ICC explained that Canadian National would not have to abandon its Grand Trunk Eastern line because even Canadian National's "worst-case scenario" of $12.5 million diversion "represent[s] a mere fraction of 1 percent of CN's 1980 gross freight revenue." *Id.* at 352.[37] Second, there was "no indication in the record that [Guilford] has any intention of downgrading this interchange relationship." *Id.* Third, Guilford would not have an incentive to downgrade "since substantial traffic through these interchanges is nondivertible." *Id.* Finally, Canadian National "possesses sufficient competitive leverage to adequately combat any possible diversions of traffic" by virtue of its "single-line system

between [Maine and the midwest] and the ratemaking flexibility inherent in such a system." *Id.*

We have substantial difficulties with each of these arguments. Cumulatively, the weaknesses in the ICC's arguments lead us to remand to the Commission to reconsider whether Canadian National's service will be adversely affected by the merger and, if so, whether the public interest would be advanced by restricting Guilford's ability to downgrade its interchanges with Canadian National.

B. *The Limited Relevance of Systemwide Revenues*

We consider first the ICC's belief that essential services would not be affected because the diversions from the Canadian National to the Boston & Maine represent a fraction of 1% of Canadian National's gross revenues and thus, presumably, Canadian National could underwrite any losses on its Grand Trunk Eastern line. We fail to see the relevance of Canadian National's system-wide revenues.

First, if Guilford downgrades interchanges at Danville and Yarmouth Junctions, shippers will lose the benefits of "the best transit time between Maine and the Midwest." *Boston & Maine Merger,* 366 I.C.C. at 352. Canadian National's ability to ab-

---

**36.** Guilford's subsequent acquisition of the Delaware & Hudson, which extends the Boston & Maine's east-west route further west, increases Guilford's incentive to divert traffic from the Canadian National to the Boston & Maine/Delaware & Hudson line. Canadian National accordingly repeated its request for conditions in the Delaware & Hudson merger decision. *See Delaware & Hudson Merger, supra* note 1, 366 I.C.C. at 419. The ICC denied the request, relying on the reasons it gave in its *Boston & Maine* decision. Our analysis of the Commission's reasoning applies equally to both decisions, and is incorporated by reference in the companion case to this one reviewing the Delaware & Hudson merger. *See Central Vermont Railway v. ICC, supra* note 1, 711 F.2d at 300.

**37.** The ICC used similar reasoning to reject Canadian Pacific's request for protective conditions. *See Boston & Maine Merger,* 366 I.C.C.

at 350 (even under Canadian Pacific's "worst-case scenario concerning diversions ..., revenue lost ... would be less than one-half percent of its gross revenues"). *See also Union Pacific—Control—Missouri Pacific, supra* note 21, 366 I.C.C. at 546 (threshold step in analyzing whether a merger will harm essential services is determining "gross revenue impact on non-included carriers"); *Norfolk Southern—Control—Norfolk & Western, supra* note 21, 366 I.C.C. at 213 (diversion estimate "represents only about seven-tenths of 1 percent of [the competing carrier's] gross revenue and will not threaten any essential services"); *Burlington N., Inc.—Control & Merger—St. Louis-S.F. Ry.,* 360 I.C.C. 784, 952 ("Where a carrier can sustain and absorb losses from traffic diversion, protective conditions are not warranted.") (footnote omitted), *aff'd sub nom. Missouri-Kan.-Tex. R.R. v. United States,* 632 F.2d 392 (5th Cir.1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).

sorb the resulting revenue loss will not change that fact.

Second, the ICC's emphasis on Canadian National's financial strength and neglect of the profitability of the Grand Trunk Eastern line ignores Canadian National's incentive to maximize profits by shedding money-losing operations. Nothing in the record supports the implausible proposition that Canadian National will indefinitely subsidize losses on its Grand Trunk Eastern line. On the contrary, undisputed testimony from Canadian National's President establishes that Canadian National treats its branches and subsidiaries as independent "profit centers" and will not subsidize a losing branch line.[38]

Third, the ICC itself, as a policy matter, opposes on efficiency grounds the subsidizing of money-losing lines. For example, the Commission will not "under any circumstances" require one carrier to indemnify another carrier for losses due to traffic diversion, because "[t]his transfer of funds would, in effect, be a massive cross-subsidization ... of inefficient operations of another railroad." *Burlington Northern—Control—St. Louis-S.F., supra* note 37, 360 I.C.C. at 952–53.[39] Similarly, in abandonment proceedings, the Commission analyzes primarily the profitability of the line sought to be abandoned and gives little weight to the profitability of the parent railroad. *See, e.g., Illinois Central Gulf Railroad Abandonment Between Herscher & Barnes,* 363 I.C.C. 690, 703 (1980) ("Unprofitable

operations ... burden [the carrier] and interstate commerce ... [and the carrier] should not be required to continue [such] operations ..., regardless of whether it is financially capable of doing so ...."), *aff'd sub nom. Bloomer Shippers Association v. ICC,* 679 F.2d 668 (7th Cir.1982).[40] The ICC, to be true to this policy, should not expect Canadian National to operate an inefficient, money-losing line.

In sum, the ICC's belief that Canadian National's overall profitability would permit Canadian National to preserve existing service on its Grand Trunk Eastern line ignores Guilford's unilateral ability to downgrade interchange service, is unsupported by evidence in the record, and is contrary to Commission policy.

This is not to say that Canadian National's Grand Trunk Eastern line will be unprofitable once the Maine Central merges with the Boston & Maine. Canadian National asserts that the Grand Trunk Eastern line will sustain heavy losses as a result of diversion of traffic to the Boston & Maine,[41] but Guilford disputes this.[42] On remand, the ICC will have an opportunity to decide this factual question.[43]

## C. Guilford's Intent to Maintain Present Service

A second major factor leading the ICC to conclude that the merger would not affect Canadian National's service was that the record gave "no indication" that Guilford

**38.** Verified Statement of Ronald Lawless, President, CN Rail, at 6 (Jan. 6, 1982), J.A. at 2196, 2201.

**39.** *See also* 49 C.F.R. § 1180.1(d)(1) (1982) (explaining the ICC's policy against indemnification) (quoted in note 8 *supra* ).

**40.** *See also Abandonment of Rail Lines—Use of Opportunity Costs,* 360 I.C.C. 571, 577 (1979) (requiring a carrier to operate marginally profitable lines "is highly questionable as a matter of national transportation policy"), *aff'd sub nom. Farmland Indus. v. United States,* 642 F.2d 208 (7th Cir.1981).

**41.** *See* Verified Statement of Ronald Lawless, *supra* note 38, at 10, J.A. at 2205.

**42.** *See* Guilford Brief at 11 n. 10 (Canadian National allocates revenues "so that traffic

which originates in the United States and traverses CN in Canada is profitable in Canada but unprofitable in the United States.") (citing Hearing Transcript, Feb. 11, 1982, at 951–52, J.A. at 726–27 (testimony of Ronald Lawless, President, CN Rail)).

**43.** In deciding this issue, the ICC may also need to resolve the wide discrepancy between Guilford's $2 million traffic diversion estimate and Canadian National's $8 million estimate ($12.5 million if interchange service is downgraded). Canadian National may then wish to renew its claim that Guilford's traffic study is so seriously flawed as not to constitute "substantial evidence" to support the Commission's findings. We do not reach that issue here.

intended to downgrade service at the Danville and Yarmouth interchanges. 366 I.C.C. at 352. We think this factor is entitled to little if any weight.

First, the record shows only that Guilford has no *present* intent to downgrade interchange service. Guilford made no promises concerning the future. Thus, Guilford's owner, Mr. Mellon, when asked if he would "give Guilford's assurance" that it would preserve service at Danville and Yarmouth Junctions, gave an equivocal answer—"[i]f the economic circumstances are somewhat what they are today."[44] Moreover, Guilford opposed Canadian National's request for conditions, thus reserving for itself the right to decrease service in the future.

■ Second, as the Commission itself has recently recognized, self-serving statements by a merging railroad's officers are entitled to little credence. *See Norfolk & Western—Control—Detroit, Toledo & Ironton, supra* note 27, 360 I.C.C. at 512 (promise by two competing railroads to operate independently a third competing line is "self-serving and must be examined closely . . . . It is difficult to expect sacrificial behavior from profit seeking corporations into the indefinite future."). Guilford will, we expect, seek to maximize profits. If it can profitably downgrade interchanges with Canadian National, Guilford will have strong incentives to do so, notwithstanding its current disclaimers. Thus, Guilford's actual financial incentives, not its professed intent, must be the dominant concern. We consider those incentives next.

## D. *Guilford's Incentives to Downgrade Interchange Service*

The ICC's third reason for rejecting protective conditions at Danville and Yarmouth Junctions was that "it would not appear to be to [Guilford's] benefit for such

deterioration [of interchange service] to take place, since substantial traffic through those interchanges is nondivertable." *Boston & Maine Merger,* 366 I.C.C. at 352.[45] We think that the Commission failed to analyze properly Guilford's incentives to downgrade interchange service.

### 1. *Guilford's Incentives in Antitrust Theory*

The Maine Central is the only railroad providing east-west service to the Maine paper industry. Moreover, Canadian National claims, and the Commission does not dispute, that most of the Maine Central's traffic is captive to rail—trucks are not a significant source of competition.[46] Thus, the Maine Central has market power over rail traffic to and from Maine. As a theoretical matter, then, the Maine Central may be able to increase profits by altering its interchange service.

The merger of the Maine Central with the Boston & Maine is, in antitrust terminology, a "vertical" merger. Ordinarily, a vertically integrated monopolist has no incentive to use its monopoly power over one level of production (rail service in Maine) to increase profits at another level (rail service from Maine to the midwest). As the leading treatise puts it, "there is but one maximum monopoly profit to be gained" from a monopoly of one level of production, and that profit may be gained directly at the monopolized level (here, rail service in Maine) through appropriate pricing. 3 P. Areeda & D. Turner, *Antitrust Law* § 725b (1978). There is an exception to this rule, however, for a regulated monopolist, which may be able to obtain from a second level of production "the monopoly profits which effective regulation of the franchised monopoly precludes." *Id.* ¶ 726e (footnote omitted).[47]

---

**44.** Hearing Transcript, Jan. 4, 1982, at 271, J.A. at 282 (testimony of Timothy Mellon).

**45.** Elsewhere in its opinion, the Commission gave a similar explanation: "the volume of traffic through the Danville and Yarmouth interchanges will remain too high and profitable for [Guilford] to risk downgrading service

there." *Boston & Maine Merger,* 366 I.C.C. at 342.

**46.** *See* Canadian National Brief at 13.

**47.** *See also Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (Otter Tail Power illegal-

The Maine Central is, of course, a regulated monopolist. It is barred by the ICC from charging a monopoly price for rail service to Maine,[48] but may be able to use its control over service at Danville and Yarmouth Junctions to shift its potential monopoly profit to the Boston & Maine. Indeed, the ICC itself has recently recognized the risk of such conduct. *See Union Pacific—Control—Missouri Pacific, supra* note 21, 366 I.C.C. at 529:

> [In an end-to-end merger], the consolidated system may profit by limiting the "downstream" competition [from connecting carriers] and routing traffic over its own lines from origin to destination.... This vertical foreclosure effect will occur, if at all, at the gateways served commonly by the consolidating carriers.

We do not know whether Guilford will *in fact* profit by downgrading interchange service, but the risk is substantial. Indeed, Areeda and Turner believe that the probability that a vertically integrated, regulated monopolist will abuse its market power is "peculiarly high." *Id.* ¶ 726e, at 218. They would forbid vertical integration by a regulated monopolist except in cases where regulatory authorities "can more or less easily exercise the power to prohibit refusals to sell and to specify the price and other terms of sale." *Id.* ¶ 726e, at 219 (footnote omitted). In this case, the ICC permitted vertical integration but declined to exercise its power to control the "terms of sale" between the Maine Central and the Canadian

National. The question is whether that decision was reasonable.

### 2. Guilford's Actual Incentives

We do not think that the Commission gave Guilford's possible incentives to downgrade interchange service the scrutiny they deserve. As we understand its terse explanation, the Commission's conclusion that Guilford has no incentive to downgrade rests on two premises, the first explicit, the second implicit. First, Guilford will continue to transfer substantial amounts of traffic to Canadian National at Danville and Yarmouth Junctions. Second, if Guilford downgrades interchange service, it will earn less profit on nondivertible traffic.

The first premise is undisputed in the record, though Guilford and Canadian National disagree on how much traffic will be diverted.[49] There is no record evidence regarding the second premise. The premise is plausible, if only because reduced service will lead some shippers to switch to trucks or produce fewer goods. But the magnitude of this effect is uncertain and may well be small. Little traffic will be lost to trucks because, for most of the Maine Central's shippers, trucks are not a feasible alternative to rail. And the record is silent on how much business Maine producers will lose to competitors elsewhere in the country if they lose fast service to the midwest.[50]

The Commission not only failed to quantify Guilford's costs from downgrading interchange service at Danville and Yarmouth Junctions, it also ignored the benefits to

ly used its dominance over wholesale power transmission to "foreclose potential [competitors in] the retail area from obtaining electric power"); *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (railway terminal company reorganized to prevent it from abusing its monopoly over rail traffic into St. Louis); *Chesapeake & Ohio Ry. v. United States,* 704 F.2d 373, 377 (7th Cir. 1983) ("regulatory distortions ... might make the closing of efficient through routes profitable conduct for [a railroad] when in an unregulated market it would be commercial suicide").

**48.** *See* 49 U.S.C. §§ 10,101a(6), 10,709 (ICC must limit rates charged by "market dominant" carriers).

**49.** Canadian National estimates diversion losses of almost half of the traffic currently carried over the Grand Trunk Eastern line—11,600 cars out of a current total of 25,700 cars per year. *See* Verified Statement of James Metsos, System Manager, CN Rail, Jan. 7, 1982, at 29, 38, J.A. at 2240, 2268, 2277.

**50.** In *Union Pacific—Control—Missouri Pacific, supra* note 21, 366 I.C.C. at 528–29 & n. 71, the Commission discussed the role of such "source competition" in limiting the anticompetitive effects of a railroad merger but placed little weight on this factor.

Guilford from increased diversion. The Commission does not dispute that some additional diversion will occur. We can only speculate as to the amount of diversion and how profitable the diverted traffic will be to Guilford.

Without quantifying the costs or even discussing the benefits to Guilford from downgrading interchange service, the ICC could not rationally conclude that Guilford will not have an incentive to downgrade. On remand, the Commission must ascertain more carefully where Guilford's incentives actually lie.

We do not suggest that the Commission will be able to predict Guilford's future behavior with absolute accuracy. Rather, Guilford's incentives or disincentives to downgrade will be "primarily a question of probabilities, and thus peculiarly subject to the expert experience, discretion, and judgment of the Commission." *Missouri-Kansas-Texas Railroad v. ICC,* 632 F.2d 392, 406 (5th Cir.1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). But our deference to its ultimate choice does not relieve the Commission of the duty to explain, based on substantial evidence in the record, whether Guilford will or will not have an incentive to downgrade interchange service.

E. *Canadian National's Competitive Leverage*

The ICC's final reason for believing that Guilford would not downgrade interchange service was Canadian National's power to take effective opposing steps. The Commission explained:

> [Canadian National (CN)] possesses sufficient competitive leverage to adequately combat any possible diversions of traffic. The CN-[Maine Central] connection still affords shippers the best transit time between Maine and the Midwest. By virtue

of operating a single-line system between these two regions of the country, and the ratemaking flexibility inherent in such a system, CN is able to assert a great deal of influence in the routing of traffic. *Boston & Maine Merger,* 366 I.C.C. at 352. This reasoning is none too clear, but we understand the Commission to suggest two sources of Canadian National's "competitive leverage." First, Canadian National's route is the fastest. Second, Canadian National's long haul over a single system gives it "ratemaking flexibility."

We fail to understand the first claim. That Canadian National can potentially provide the fastest route to the midwest will not do it much good if Guilford unilaterally destroys that advantage. As for "ratemaking flexibility," we are not sure what the Commission means by the term, but we can see two possibilities. First, Canadian National can recoup lost traffic by cutting its prices to shippers. Second, Canadian National can pay Guilford to maintain current interchange service by giving Guilford a larger share of the total Maine-to-midwest freight charge.

Price cuts to shippers, however, will not restore the Canadian National's current fast, efficient service to the midwest. Moreover, price cuts offer scant promise of returning the Grand Trunk Eastern to profitability. In the long run, if the Grand Trunk Eastern loses money, Canadian National will presumably close it down.

Canadian National may temporarily preserve fast service by giving Guilford a larger share of joint revenues. Such payments, however, can only reduce the Grand Trunk Eastern's profitability, which in the long run is essential to service of any kind, let alone fast service.[51] We conclude, therefore, that the Commission unreasonably re-

---

**51.** Giving Guilford a larger share of joint revenues may not even preserve fast service in the short run. As the Commission recently recognized in its *Rulemaking Concerning Traffic Protective Conditions, supra* note 27, 366 I.C.C. at 125–26, a competing carrier who participates in an efficient joint route (*i.e.,* Canadian National)

may be unable to pay enough to persuade the other participating carrier (*i.e.,* Guilford) to prefer a joint route over the other carrier's less efficient single-line route. The record is silent on whether Canadian National can offer enough to persuade Guilford to maintain current interchange service.

lied on Canadian National's "competitive leverage" to preserve existing service.

## F. *Potential Harm from Protective Conditions*

Having considered the possible need to preserve interchange service at Danville and Yarmouth Junctions,[52] we turn briefly to the possible harm from imposing protective conditions. Canadian National's requested conditions, as described by the ICC, were:

> [Maine Central] shall preserve and continue at a minimum its practices existing on October 31, 1981 in connection with handling freight traffic over the routes with the Grand Trunk Eastern and at the interchange points at Danville Junction and Yarmouth Junction, ME. Changes in present operating arrangements, schedules of service, blocking and handling of freight traffic interchanged at these junctions shall be made only with the concurrence of Canadian National Railway.

*Boston & Maine Merger* app. B, 366 I.C.C. at 365. The ICC explained that these conditions were relatively "narrow in scope" and would have little effect on competition, but would reduce Guilford's ability to improve service on its own system:

They do not appear to affect rates or diversions [sic], but rather freeze existing practices with respect to operating arrangements, schedules, and the blocking and handling of freight moving over Danville and Yarmouth Junctions in Maine. While the competitive effect of these conditions is not clear, imposition of these conditions would at least reduce [Guilford's] flexibility in improving the service capabilities on its own system. *Id.* at 352.[53]

Canadian National urges that its proposed veto over changes in operating arrangements would not "freeze existing practices." Canadian National points out that if it used its veto, Guilford could appeal to the Commission, which could grant relief from the condition in a proper case. *See Southern Pacific Co.—Merger—Pacific Electric Railway,* 354 I.C.C. 100, 109–10 (1977). We see little force to this argument. Guilford would still be burdened by the delay involved in an appeal to the ICC. Thus, as a practical matter, Canadian National's veto would substantially reduce Guilford's flexibility.

On the other hand, the ICC is not restricted to choosing between Canadian National's requested conditions and no conditions at all.[54] On the contrary, if the Com-

---

**52.** Technically, we have addressed, as did the Commission, only the probability that protective conditions will be needed and not the amount of public benefit from preserving Canadian National's service. There is little doubt, however, that the amount of benefit is substantial. There are now three competing railroads in the Maine-to-midwest corridor: Guilford, Canadian National, and Canadian Pacific. If Canadian National withdraws from the competition because of losses on its Grand Trunk Eastern line, only two competitors will be left. The ICC has recently held in reviewing another merger that loss of one of three existing competitors is "a substantial lessening of competition." *Union Pacific—Control—Missouri Pacific, supra* note 21, at 531. We do not see why a different result would obtain here.

Moreover, Canadian National's route is more efficient—in time, energy use, and switching costs—than the Boston & Maine route. Unless the difference in efficiency is minor, the public interest supports preserving the more efficient route. *See United States v. Lowden,* 308 U.S. 225, 230, 60 S.Ct. 248, 251, 84 L.Ed. 208 (1939)

("the term public interest ... 'has direct relation to adequacy of transportation service [and] to its essential conditions of economy and efficiency' ") (quoting *Texas v. United States,* 292 U.S. 522, 531, 54 S.Ct. 819, 824, 78 L.Ed. 1402 (1934)); *Chesapeake & Ohio Ry. v. United States,* 704 F.2d 373, 377 (7th Cir.1983) ("If the closed routes ... are more efficient than the alternative routes that remain open, the [closings] are not in the public interest.").

**53.** Canadian National objects that it did request rate conditions. Canadian National Brief at 67–68. We do not address the possible need for rate conditions at this time. Our discussion is limited, as was the Commission's, to Canadian National's less anticompetitive request for protection against service changes. On remand, Canadian National may renew its request for rate conditions and appeal from an adverse decision by the Commission.

**54.** *See New York Cent. Sec. Corp. v. United States,* 287 U.S. 12, 28, 53 S.Ct. 45, 49, 77 L.Ed. 138 (1932) (the Commission is "not limited to

mission believes that an unconditioned merger would harm the public interest but finds a proposed condition inappropriate, its duty to advance the public interest requires it to devise appropriate conditions, if such conditions can be developed with reasonable effort. *See Baltimore & Ohio Railroad v. United States,* 386 U.S. 372, 430, 87 S.Ct. 1100, 1129, 18 L.Ed.2d 159 (1967) (Brennan, J., concurring) ("[t]he ICC is not the prisoner of the parties' submissions" and must "weigh alternatives and make its choice according to its judgment how best to achieve [Congress' policy] goals") (footnotes omitted); *Atlantic Coast Line R. Co. v. United States,* 48 F.2d 239, 244 (W.D.S.C. 4th Cir. 1931) (3-judge court) ("It is not only the right but the duty of the commission to impose such conditions as will make the acquisition in the public interest .... "), *aff'd,* 284 U.S. 288, 52 S.Ct. 171, 76 L.Ed. 298 (1932). *See also Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608, 620–21 (2d Cir.1965), *cert. denied,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).[55]

The ICC can probably design conditions that will prevent significant deterioration in transit time on the Maine Central/Canadian National route without seriously burdening Guilford. At a minimum, the Com-

mission can require Guilford to give Canadian National advance notice of service changes. It could then permit Guilford to make the changes after an expedited showing to the Commission that the changes will not disrupt joint service with the Canadian National. Alternatively, it could permit the changes unless Canadian National shows that the changes will disrupt its service to the midwest. If appropriate, the Commission can limit the duration of any conditions it imposes.[56] Other possibilities may also occur to the Commission.

### G. *Conclusion*

All four of the ICC's reasons for finding no need to impose protective conditions are seriously flawed. Cumulatively, they show failure by the Commission to "consider all of the relevant factors and demonstrate a reasonable connection between the facts on the record and the resulting policy choice." *Sierra Club v. Costle,* 657 F.2d 298, 323 (D.C.Cir.1981) (footnote omitted). We therefore remand to the Commission to reconsider the public benefit from protective conditions, taking into account the factors identified in this opinion.[57]

---

conditions proposed or favored by the carriers"); Illinois Cent. Gulf R.R.—Acquisition—Gulf, Mobile & Ohio R.R., 338 I.C.C. 805, 844–45 (1971), *aff'd sub nom. Missouri Pac. R.R. v. United States,* 346 F.Supp. 1193 (E.D.Mo.1972) (3-judge court), *and also aff'd sub nom. Kansas City S. Ry. v. United States,* 346 F.Supp. 1211 (W.D.Mo.1972) (3-judge court), *both decisions aff'd mem.,* 409 U.S. 1094, 93 S.Ct. 902, 34 L.Ed.2d 679 (1973).

**55.** Congress has at times noted its belief that the ICC should take an active role in structuring transactions to advance the public interest. *See* S.Rep. No. 499, 94th Cong., 1st Sess. 19 (1975), 1976 U.S.Code Cong. & Ad.News at 32–33 (criticizing the ICC's passive role in merger proceedings); H.R.Doc. No. 678, 78th Cong., 2d Sess. 53 (1944) (ICC "is not intended to be a passive arbiter but the 'guardian of the general public interest,' with a duty to see that this interest is at all times effectively protected") (footnote omitted).

**56.** See *Burlington Northern—Control—St. Louis-S.F., supra* note 37, 360 I.C.C. at 957 (imposing traffic protective conditions for two

years to give carriers "time to adjust to the new competitive climate").

**57.** In light of this disposition, we do not reach Lamoille Valley's claim that the ICC imposed an undue burden of proof on railroads seeking protective conditions. It is implicit in our analysis, however, that if the Commission imposes too heavy a burden on competing railroads to prove the need for protective conditions, a reviewing court may find that the Commission has neither met its affirmative duty to determine whether the unconditioned merger is consistent with the public interest nor developed substantial evidence to support its conclusions. *Cf. ICC v. J–T Transp. Co.,* 368 U.S. 81, 89–90, 82 S.Ct. 204, 209–210, 7 L.Ed.2d 147 (1961):

Had the Commission, having drawn out and crystallized the [ ] competing interests [of railroads and shippers], attempted to judge them with as much delicacy as the prospective nature of the inquiry permits, we should have been cautious about disturbing its conclusion.

But ... we are under no compulsion to accept its reading where, as here, we are

We recognize the complexity of this endeavor. In all likelihood, the probability that Guilford will downgrade interchange service will be greater than zero and less than 100%. The magnitude of public harm from downgrading will be uncertain as well. From these two uncertainties, the Commission will have to compute a rough, perhaps unquantified estimate of expected public benefit from protective conditions, and weigh that benefit against the equally speculative cost of restricting Guilford's future flexibility.

Once that balancing has been done, we will not lightly disturb the Commission's ultimate conclusion. On the record before us, however, the Commission has both ignored relevant factors and reached conclusions unsupported by substantial evidence in the record. It has not, in short, exercised that modicum of care that would permit us to approve its decision as "reasonable." [58]

V. LABOR PROTECTIVE CONDITIONS

▮ In reviewing a railroad merger, the ICC must consider, as part of its public interest determination, "the interest of carrier employees affected by the proposed transaction." 49 U.S.C. § 11,344(b)(1)(D). Moreover, *id.* § 11,347 requires the ICC to protect displaced employees:

> When a rail carrier is involved in a transaction for which approval is sought under [§ 11,344], the Interstate Commerce Commission shall require the carrier to provide a fair arrangement ... [for] employees who are affected by the transaction .... Notwithstanding this [Act], the arrangement may be made by the rail carrier and the authorized representative of its employees.

The Commission provided suitable arrangements for Maine Central and Boston &

Maine employees. It did not consider the interests of, nor provide protection for, employees of competing railroads who may lose their jobs as a result of traffic diversions. *See Boston & Maine Merger,* 366 I.C.C. at 344. Lamoille Valley asserts that this was error. We affirm the Commission's interpretation of §§ 11,344(b)(4) and 11,347 as requiring it to protect only employees of the merging railroads and not employees of other railroads.

First, the ICC's interpretation of the language of § 11,347 is sensible. The second sentence of § 11,347 provides that "the arrangement may be made by *the rail carrier* and the authorized representative of *its* employees." (Emphasis added.) The phrase "the rail carrier" presumably refers back to the preceding sentence and thus includes only "a rail carrier ... involved in the transaction." But an arrangement between "a rail carrier involved in the transaction" and "its employees" will not protect employees of other carriers. Thus, Congress must not have contemplated protecting employees of nonapplicant railroads. As for § 11,344(b)(4), it was first enacted at the same time as § 11,347, and the two sections should be construed *in pari materia.*

The legislative history of § 11,347 strongly supports this interpretation. *See Missouri-Kansas-Texas Railroad v. United States,* 632 F.2d 392, 411–12 (5th Cir.1980) (reviewing the legislative history), *aff'g Burlington Northern—Control—St. Louis-S.F., supra* note 37, 360 I.C.C. at 948–50, *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).[59]

Second, while there may be policy reasons for treating all railroad employees alike regardless of their employer, the Commission's interpretation is supported by considerations of practicality and administrative

---

convinced that it has loaded one of the scales.... [B]y assigning to the applicants the burden of proving the inadequacy of existing services, the Commission [improperly] favored the interests [of competing carriers] at the expense of the shippers' ....

**58.** We see no need to provide any protection for Canadian National pending the ICC's recon-

sideration. Guilford is unlikely to downgrade interchange service while the Commission is still considering the need for protective conditions.

**59.** *See generally New York Dock Ry. v. United States,* 609 F.2d 83, 86–90 (2d Cir.1979) (reviewing at length the development of § 11,347 and predecessor provisions).

economy. As the Commission explained in *Burlington Northern,* 360 I.C.C. at 949–50:

It is difficult enough to determine which employees of a railroad involved in the transaction have been adversely affected by that transaction. To require a determination that employees of another competing carrier have also been affected by a merger ... would place an impossible burden on the party required to rebut the allegation.

Third, the Commission has consistently interpreted § 11,347, since its original enactment in 1940, to exclude employees of non-applicant railroads.[60] That consistent interpretation is entitled to deference, especially since Congress implicitly approved that interpretation in revising and reenacting § 11,347 in 1976.[61] *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) (additional deference to an agency's statutory interpretation is due "where Congress has reenacted the statute without pertinent change") (footnote omitted).

Finally, other courts that have addressed this issue have consistently approved the Commission's interpretation, including the only court to consider the issue since the 1976 amendments to the Interstate Commerce Act. *See Missouri-Kansas-Texas Railroad v. United States,* 632 F.2d 391, 411–12 (5th Cir.1980) (a thorough opinion on which our own analysis relies heavily), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981); *Florida East Coast Railway v. United States,* 259 F.Supp. 993, 1019 (M.D.Fla.1966) (3-judge court), *aff'd mem. in part and appeal dismissed in relevant part as moot,* 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967); *Railway Labor Executives' Association v. United States (RLEA 2d),* 226 F.Supp. 521, 524–25 (E.D.Va.) (3-judge court), *vacated and remanded per curiam,* 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964).[62]

## VI. PROCEDURAL ISSUES

### A. Must Mr. Mellon Join the Merger Application?

■ Guilford sought ICC permission to acquire the Boston & Maine under 49 U.S.C. § 11,343(a)(5), which requires ICC approval for:

acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.

*Id.* § 11,343(b), in turn, provides:

A person may carry out a transaction referred to in subsection (a) ... only

---

**60.** *See Missouri-Kansas-Texas Railroad v. United States,* 632 F.2d at 411 n. 44 (citing ICC cases); *see also CSX—Control—Chessie System, supra* note 21, 363 I.C.C. at 590–91.

Pennsylvania R.R.—Merger—New York Cent. R.R., 347 I.C.C. 536, 546 (1974), cited by Lamoille Valley, is not to the contrary, despite the ICC's use of certain broad language. The Commission there construed the predecessor to § 11,347 to cover employees of wholly-owned *subsidiaries* of the merging railroads. It had no occasion to address the status of employees of independent railroads.

**61.** The 4R Act, *supra* note 5, § 402(a), 90 Stat. at 62, added the requirement that labor protective conditions be "no less protective of the interests of employees than those heretofore imposed pursuant to this [section]." Section 402(a) was a last-minute addition to the statute, and there is no legislative history dealing with it. *See New York Dock Ry. v. United States,* 609 F.2d 83, 93 (2d Cir.1979). This provision was rephrased to its present form without substantive change in the 1978 recodification of the Interstate Commerce Act. *See* 49 U.S.C. note preceding § 10,101 (no substantive change intended); *id.* § 11,347 revision note (explaining wording changes).

**62.** *But see Soo Line R.R. v. United States,* 280 F.Supp. 907, 921–24 (D.Minn.1968) (3-judge court); *United Transp. Union, Local Lodge No. 693–E v. Burlington N., Inc.,* 319 F.Supp. 451, 453–54 (D.Minn.1970) (following *Soo Line*).

*Railway Labor Executives' Ass'n v. United States (RLEA 1st),* 216 F.Supp. 101 (E.D.Va. 1963) (3-judge court), cited by Lamoille Valley, is distinguishable. It involved a joint facility run by a merging railroad and a non-merging railroad. The court held that employees working at the facility, who were nominally employees of the non-merging railroad but in fact worked for both railroads, were entitled to protection. *See id.* at 103. A year later, the same court, including two of the three judges that decided *RLEA 1st,* upheld the ICC's refusal generally to protect employees of non-merging railroads in *RLEA 2d.*

with the approval and authorization of the Commission.

Section 11,343(a)(5) certainly covers Guilford, as a "person" who "controls any number of carriers" (Guilford already controlled the Maine Central) and seeks control of another carrier (the Boston & Maine). It also covers Timothy Mellon, the sole owner of Guilford, who also "controls" the Maine Central (through Guilford) and seeks to control the Boston & Maine.[63]

The ICC, however, did not require Mr. Mellon to join the control application. The Commission explained that joinder would serve no useful purpose because it already had all the information it needed:

> [T]he only issue raised by any of the parties over Mr. Mellon's presence as an applicant concerns an asserted need for disclosure of his personal finances. We agree with the Administrative Law Judge, however, that Mr. Mellon's personal finances have nothing to do with this transaction. Nor has there been any suggestions of past impropriety on Mr. Mellon's part or the hint of any likelihood of future abuses. Thus, requiring Mr. Mellon to join as an applicant would be a meaningless gesture that would not advance the statute's purpose of assuring that the Commission has available to it all information relevant to its determination of the consistency of the proposed transaction with the public interest . . . .

*Boston & Maine Merger,* 366 I.C.C. at 325. The Commission conceded that "a literal reading of 49 U.S.C. 11343 and some precedent" suggested that joinder was mandatory, *id.* at 324, but the Commission believed the statute gave it discretion not to insist on pointless joinder.[64]

Lamoille Valley and Providence & Worcester assert that the joinder provisions are mandatory, not discretionary, and that unless Mr. Mellon joins the control application, the ICC has no authority to approve the merger.

We are not convinced that the ICC has correctly interpreted § 11,343. The section speaks in mandatory language—a person may acquire control of two or more carriers "only" with the ICC's approval.[65] Moreover, the Commission has for 40 years, until its sudden reversal of position in this case, consistently construed § 11,343 as mandatory. The Commission's interpretation was early upheld in *United States v. Marshall Transport Co.,* 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110 (1944). In *Marshall Transport,* a division of the ICC had approved the purchase of one carrier by a second carrier that was controlled, in turn, by a non-carrier. The full Commission reversed for failure of the non-carrier to join the application. The Supreme Court affirmed the ICC's view that the Commission was "without authority" to approve the transaction. *Id.* at 42, 64 S.Ct. at 904. Similar reasoning would suggest that Mr. Mellon must join Guilford's application here.[66]

As a policy matter, the Commission's distaste for pointless joinder has obvious ap-

---

**63.** The broad definition of control in 49 U.S.C. § 10,102(7) includes indirect control such as that enjoyed by Mr. Mellon:

"control" . . . includes actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means.

**64.** ICC Chairman Taylor, concurring, believed that § 11,343 required joinder, but agreed that "this issue has no effect on the merits" because Mr. Mellon's personal finances were not relevant to the Commission's decision. *Boston & Maine Merger,* 366 I.C.C. at 358 (Taylor, Chmn., concurring).

**65.** The predecessor to § 11,343, 49 U.S.C. § 5(5) (1976) (which § 11,343 "restates without substantive change"; *see* 49 U.S.C. note preceding § 10,101) is even more explicit:

It shall be unlawful for any person, except . . . [with the approval and authorization of the Commission], to accomplish or effectuate . . . the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever.

**66.** It is possible to distinguish *Marshall Transport* as not involving an explicit ICC finding that joinder would serve no useful purpose. The ICC, however, fails in its broader attempt to distinguish *Marshall Transport* as merely affirming the Commission's discretionary power to require appropriate persons to join a control application. *Marshall Transport* addresses both whether the Commission *may* require Un-

peal. On the other hand, it is hard to see why joinder would cause much harm.[67] Also, mandatory joinder would ensure that the parties fully inform the ICC of the actual chain of control of a carrier. Moreover, the financial status of the ultimate owner will often be relevant to a control application. A financially weak owner may drain funds from a carrier to pay other bills or lack the capital needed to expand to serve new areas.

A full resolution of this question would require close scrutiny of the legislative history plus consideration of the troublesome question of how much deference, if any, courts should give to an agency's interpretation of its governing statute when that interpretation overrules a longstanding contrary interpretation. Fortunately, we need not attempt that task here. Had the ICC required Mr. Mellon to join Guilford's control application, he presumably would have applied for waiver under 49 U.S.C. § 10,505(a), which provides:

> In a matter related to a rail carrier . . . subject to . . . this [Act], the Commission *shall* exempt a person . . . when the Commission finds that the application of a provision of this [Act]—
> (1) is not necessary to carry out the transportation policy of [49 U.S.C. § 10,101a]; and
> (2) . . . is not needed to protect shippers from the abuse of market power.

(Emphasis added.)

In light of the ICC's findings that it had no questions to ask of Mr. Mellon and that

joinder would be a "meaningless gesture," the Commission would have had to grant waiver under § 10,505(a). Thus, the Commission's failure to require joinder, if error, is not "prejudicial error," *see* 5 U.S.C. § 706 (last clause), and is not grounds for reversing the Commission's decision. *Accord Delaware & Hudson Merger, supra* note 1, 366 I.C.C. at 424–25 (Simmons, Comm'r, concurring).[68]

### B. The Expedited Procedural Schedule

As background for Canadian National's challenge to the ICC's accelerated timetable for considering the merger of the Maine Central and the Boston & Maine, we review the steps leading up to Guilford's filing of its application. Guilford tentatively agreed to buy the Boston & Maine on April 15, 1981 and formally agreed to the transaction on July 8, 1981. An amended plan of reorganization reflecting the agreement was filed with the ICC on July 15.

Several weeks later, on August 13, 1981, Congress passed the Northeast Rail Service Act of 1981 (NERSA).[69] NERSA § 1164(a), 45 U.S.C. § 1112(a), requires the ICC to decide any merger application involving a bankrupt Northeast railroad within 180 days:

> [I]n any [merger] proceeding . . . involving a [Northeast] railroad . . . which was in a bankruptcy proceeding . . . on November 4, 1979, the Commission shall,

---

ion to join the control application, *see* 322 U.S. at 36–40, 64 S.Ct. at 902, 903–904, and whether the Commission *must* do so, *see id.* at 40–42, 64 S.Ct. at 903–904. The Court's affirmative answer to the second issue was necessary to its decision because the full Commission had overruled its own division on that basis.

**67.** It appears that Mr. Mellon did not join the control application in order not to disclose his personal finances. *See Boston & Maine Merger,* 366 I.C.C. at 325. As noted in text, however, Mr. Mellon could have asked the Commission to exempt him from its jurisdiction under 49 U.S.C. § 10,505(a). Moreover, he may not have had to answer questions about his finances even if he remained as an applicant. *See* 366 I.C.C. at 325 n. 22 ("even if Mr. Mellon

were to join as an applicant, he would only be required to file an affidavit stating that he joins in [Guilford's] application").

**68.** The ICC's possible lack of "authority" to approve the merger without joinder of Mr. Mellon does not foreclose a finding of harmless error because that lack is "not strictly jurisdictional in the sense that if the Commission wrongly decides that [Mr. Mellon does not need to join the application], the Commission loses jurisdiction over [Guilford]." *Alleghany Corp. v. Breswick & Co.,* 353 U.S. 151, 171–72, 77 S.Ct. 763, 774–775, 1 L.Ed.2d 726 (1957).

**69.** Pub.L. No. 97–35, §§ 1131–1169, 95 Stat. 357, 643–87 (codified in scattered sections of 45 U.S.C.).

with or without a hearing, issue a final decision within a period not to exceed 180 days after receipt of an application . . . .

Congress specifically intended this provision to ensure speedy consideration of Guilford's proposal to acquire the Boston & Maine.[70]

The next day, August 14, 1981, Guilford notified the ICC of its intent to file a control application and requested waiver of the customary 3-month waiting period between notice of intent to file and actual filing. See 49 C.F.R. § 1180.4(b)(1) (1982) (prefiling notice period); id. § 1180.4(f) (waiver provision). The ICC granted the waiver on September 11, 1981. It explained that waiver would further Congress' intent, expressed in NERSA § 1164, that the Commission speedily consider the merger, and that interested parties would not be prejudiced because they should have been aware "for some time" of the proposed merger. The ICC further explained that because it had to issue a decision on the merger within 180 days, it could not follow the usual 31-month procedural schedule in 49 C.F.R. § 1180.4 (1982). It promised to issue an "expedited procedural schedule" after receiving the application.[71] Guilford filed its application on October 28, 1981, and one week later, on November 4, 1981, the ICC issued the promised 180-day schedule. The schedule gave competing railroads 60 days (instead of the usual 90) to file responsive applications.[72]

Canadian National alleges that the ICC's actions left it without enough time properly to prepare a responsive application. It argues that the ICC abused its discretion in waiving the 3-month prefiling notice period and that the expedited procedural schedule was a "rule" within the meaning of the APA, 5 U.S.C. §§ 551(4), 553, and was improperly issued without notice and comment.

At a practical level, we think that the ICC did an admirable job in compressing its procedures into a minimum time without undue prejudice to the parties. Canadian National makes only one concrete suggestion on what the Commission should have done differently—the Commission should have required an extended prefiling notice period to compensate for the accelerated 180-day post-filing schedule mandated by Congress. That suggestion—though perhaps technically consistent with NERSA § 1164—runs directly counter to Congress' intent that the merger be considered quickly.

Turning to Canadian National's legal argument, we find no abuse of discretion in the Commission's decision to compress the proceedings slightly by waiving the 3-month prefiling notice period. The Commission's explanation for its action is reasonable and consistent with congressional intent. We can ask no more. We also hold that the procedural schedule was exempt from notice and comment requirements as a "rule[ ] of agency procedure." 5 U.S.C. § 553(b)(A).[73]

---

**70.** NERSA § 1164(a) was directed at Guilford's proposal to acquire the Boston & Maine and id. § 1164(b), 45 U.S.C. § 1112(b) (which requires a decision within 180 days on a merger involving a non-bankrupt Northeast carrier that has received certain federal loans), was directed at Guilford's proposal to acquire the Delaware & Hudson. The Conference Committee explained:

This [bill] provides an expedited review and decision process for the application to acquire the D & H Railroad. The expedited procedures are necessary given the present cash position of the carrier . . . . A similar provision is included . . . for the Boston & Maine Railroad.

127 Cong.Rec. S9056, S9066 (daily ed. July 31, 1981) (explanatory statement of the conferees).

**71.** Guilford Transp. Indus.—Control—Boston & Maine Corp., Finance Docket No. 29,720 (Sub-No. 1), at 2 (Sept. 11, 1981) (not printed); see Boston & Maine Merger, 366 I.C.C. at 329 (explaining the Commission's reasoning in more detail and noting that Guilford's plans had received "considerable media attention" well before it submitted its prefiling notice).

**72.** Guilford Transp. Indus.—Control—Boston & Maine Corp., Finance Docket No. 29,720 (Sub-No. 1) (Nov. 4, 1981) (not printed), J.A. at 1.

**73.** In light of this conclusion, we do not reach the question whether the ICC had "good cause" under the APA, 5 U.S.C. § 553(b)(B), to dispense with notice and comment.

It is clear, at the outset, that the procedural schedule is a "rule," as defined broadly in 5 U.S.C. § 551(4) to include not only substantive rules but also:

> the whole or a part of an agency statement of general or particular applicability and future effect . . . describing the organization, procedure, or practice requirements of an agency.

The APA's notice and comment requirements apply, however, only to substantive rules and not to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A). It is hard to characterize the agency statement at issue here as anything other than a rule of "procedure."

That is not quite the end of the inquiry, for all procedural rules affect substantive rights to greater or lesser degree. Our cases recognize that when an agency rule "jeopardizes the rights and interests of parties . . ., it must be subject to public comment," even if the rule can in some sense be called "procedural." *Batterton v. Marshall,* 648 F.2d 694, 708 (D.C.Cir.1980) (footnote omitted). The issue is one of degree—whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.

In applying this general principle to this case, we begin by noting that the time schedule at issue here is definitely at the procedural end of a spectrum running from "procedural" to "substantive." Thus, we put to one side cases like *Batterton* where a rule has definite substantive consequences but can arguably be called either "procedural" or "substantive," and a court must decide which it is.[74] When a rule prescribes a timetable for asserting substantive rights, we think the proper question is whether the time allotted is so short as to foreclose effective opportunity to make one's case on the merits. This standard allows an agency ample discretion to structure its proceedings as it sees fit. However, when an agency abuses that discretion by creating extreme procedural hurdles that foreclose fair consideration of the underlying controversy, a court, by remanding for notice and comment, can ensure that the agency explores the substantive consequences of its "procedural" rule.

We do not think that Canadian National's ability to file a responsive application was substantially abridged by the Commission's procedural schedule. The ICC was constrained by Congress to reach a decision within 180 days. It gave competing railroads 75 days to file a responsive application (60 days plus a two-week extension). This allotment—almost half of the 180 days that Congress gave the ICC to reach a decision, and only a bit less than the 90 days allowed in a normal 31-month merger proceeding—was more than sufficient to permit Canadian National to develop its response. *Accord Ranger v. FCC,* 294 F.2d 240, 244 (D.C.Cir.1961) (30-day time limit for filing competing license application); *Pennsylvania v. United States,* 361 F.Supp. 208, 220–22 (M.D.Pa.) (3-judge court) (accelerated railroad abandonment procedures), *aff'd mem.,* 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973).[75]

---

**74.** In such cases, courts inquire into how serious the substantive consequences are. *See Batterton,* 648 F.2d at 708 (agency's choice of a methodology for calculating unemployment rates affects federal funding levels and thus "trenches on substantial private rights"); *National Ass'n of Home Health Agencies v. Schweiker,* 690 F.2d 932, 949 (D.C.Cir.1982) (following *Batterton*), *cert. denied,* —— U.S. ——, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); *Pickus v. United States Bd. of Parole,* 507 F.2d 1107, 1112 (D.C.Cir.1974) (parole guidelines have a "substantial effect" on parole decisions), *overruled in part on other grounds in Califano v. Sanders,* 430 U.S. 99, 104, 97 S.Ct. 980, 983–984, 51 L.Ed.2d 192 (1977); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 482 (2d Cir. 1972); *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90, 96 (D.D.C.1967) (3-judge court), *aff'd mem.,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

**75.** *See also Hall v. EEOC,* 456 F.Supp. 695, 701–02 (N.D.Cal.1978); *cf. Kessler v. FCC,* 326 F.2d 673, 680–81 (D.C.Cir.1963) (temporary halt on processing new radio license applications); *Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948, 952–53 (6th Cir.1971) (freeze on cable TV applications).

For a case where a "procedural" rule did preclude a party from making its case on the

C. *ICC Jurisdiction over Holding Company Securities*

 To buy the Maine Central and later the Boston & Maine, Timothy Mellon created a holding company—Guilford—and had Guilford issue stock and bonds to him in return for the cash to make the purchases with. He neither sought nor obtained ICC approval for these transactions.

Under 49 U.S.C. § 11,301(b)(1), a "carrier"—defined in *id.* § 11,301(a)(1) to include "a corporation organized to provide transportation by rail"—must obtain ICC approval before issuing securities, and unapproved securities are "void." Providence & Worcester asserts that Guilford, as a holding company created to acquire railroad properties, is a "carrier" subject to § 11,301 and that Guilford's non-approved securities are void. The ICC responds that it lacks jurisdiction to review Guilford's issuance of securities because Guilford is not a "carrier" but merely a holding company that owns carriers.

We uphold the ICC's interpretation of § 11,301(b)(1) as not granting it jurisdiction over securities issued by a holding company. Although the Commission very early took a view similar to that now espoused by Providence & Worcester, its current interpretation has not changed since 1960.[76] That long-held interpretation is entitled to substantial deference, and we find it "sufficiently reasonable to be accepted." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

The language of § 11,301 does not inexorably command either result. But other provisions of the Act show that Congress understood the difference between a "carrier" and a holding company that owns a carrier. In particular, 49 U.S.C. § 11,348 provides that when the ICC approves a merger in which "a person not a carrier" acquires control of two or more carriers, "the person is subject, as a carrier, to [§ 11,301]."[77] Thus, if Congress had wanted to include holding companies within the ambit of § 11,301, it knew how to say so. Moreover, the ICC's construction preserves independent force for § 11,348. If § 11,301 covers holding companies that own carriers, § 11,348 would be surplusage.

It is true that the ICC's interpretation permits a carrier to exempt itself from the Commission's securities jurisdiction by inserting a holding company between itself and its stockholders. But the Securities and Exchange Commission will continue to regulate the holding company's issuance of securities to the public. Thus, the primary purpose of § 11,301—to protect investors, *see Association of American Railroads v. United States,* 603 F.2d 953, 968–70 (D.C. Cir.1979) (reviewing legislative history)—will not be lost. Only the secondary purpose—to ensure that railroads have sound finances—is weakened. There is no evidence in the record that this limited loophole has caused significant problems for the Commission in the past.[78] Thus, the apparent flaw in the statutory scheme gives us

merits and thus required notice and comment, see *Brown Express v. United States,* 607 F.2d 695, 701–02 (5th Cir.1979) (motor carrier seeking temporary 30-day operating authority no longer needs to notify competitors that it is applying for temporary authority) (court relies, however, on a "substantial impact" test, *see* cases cited in note 74 *supra*).

**76.** *See* Stock of Atl. Coast Line, 131 I.C.C. 345 (1927), *overruled in* Woods Indus.—Control— United Transps., Inc., 85 M.C.C. 672, 678 (1960).

**77.** *See also* 49 U.S.C. § 10,102(7) (defining "control" to include "the power to exercise control through ... a holding or investment

company"); *id.* § 11,343(a)(5) (ICC must approve "acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers").

**78.** *See Brotherhood of Ry. Clerks, Consol. Sys. Bd. of Adjustment 46 v. Burlington N., Inc.,* 671 F.2d 1085 (8th Cir.1982) (affirming the ICC's approval of Burlington Northern's plan to establish a holding company to hold its rail properties; all parties assumed that the holding company would be exempt from ICC supervision under § 11,301); *cf. United Parcel Serv. v. United States,* 612 F.2d 277 (7th Cir.1979) (assuming that a holding company that owns a carrier is not itself a carrier), *cert. denied,* 445 U.S. 971, 100 S.Ct. 1664, 64 L.Ed.2d 248 (1980).

no warrant to reject the ICC's construction of its governing statute.[79]

### D. Failure to Apply for Control of the Vermont & Massachusetts Co.

The Vermont & Massachusetts line is a 56-mile segment of the Boston & Maine's main east-west line, nominally owned by the Vermont & Massachusetts Co., but leased to the Boston & Maine under a 999-year lease and thus for all practical purposes owned by the Boston & Maine. The Vermont & Massachusetts Co. owns no other significant property. Prior to the merger, it was owned 37% by the Boston & Maine, 37% by Guilford, 24% by Providence & Worcester, and 2% by others. Thus, Guilford, when it acquired the Boston & Maine, would automatically acquire control of the Vermont & Massachusetts Co. as well.

Providence & Worcester objects that Guilford failed to file a formal application to control the Vermont & Massachusetts Co. The ICC found that Guilford had made a technical misstep but decided to consider and approve Guilford's control of the Vermont & Massachusetts Co. on the merits. See Boston & Maine Merger, 366 I.C.C. at 347–48, 355. Providence & Worcester was not prejudiced by this course of action. It had actual notice of Guilford's control proposal and indeed submitted its own responsive application to purchase the Vermont & Massachusetts line, which the ICC considered and rejected. Providence & Worcester raises no substantive objections to the ICC's reasoning.

Under these circumstances, we see no harm in the ICC's waiver of a formal application. Taking, as we must, "due account ... of the rule of prejudicial error," 5 U.S.C. § 706 (last clause), we affirm the Commission.

### E. Premature Control of the Boston & Maine

Guilford's acquisition agreement with the Boston & Maine gave Guilford limited control over the Boston & Maine's activities—primarily a veto over major corporate decisions—pending ICC approval of the transaction. Providence & Worcester asserts that this control was illegal unless and until the Commission approved the acquisition, and that Guilford is therefore unfit to own the Boston & Maine. The ICC responds that Guilford could not control the Boston & Maine because the Boston & Maine, as a bankrupt, was subject to the ultimate authority of the reorganization court.

We think the parties' dispute over whether Guilford crossed the ill-defined line between control and noncontrol is largely beside the point. Premature control "does not automatically defeat a transaction." Missouri Pacific Railroad—Control—Chicago & Eastern Illinois Railroad, 327 I.C.C. 279, 322 (1965), aff'd sub nom. Illinois Central Railroad v. United States, 263 F.Supp. 421 (N.D.Ill.1966) (3-judge court), aff'd mem., 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967). Rather, it is simply a factor in the Commission's overall decision whether a merger is in the public interest. See Gilbertville Trucking Co. v. United States, 371 U.S. 115, 127, 83 S.Ct. 217, 225, 9 L.Ed.2d 177 (1962).

Here, the Commission found that the agreement was reasonable and entered into in good faith:

> The negative covenants of the acquisition agreement are no more than standard safeguards to ensure that B & M would emerge from reorganization in a position substantially similar to the one it was in at the time of the agreement. It is hardly unreasonable for [Guilford] to obtain contractual assurances that it would get what it bargained for.

Boston & Maine Merger, 366 I.C.C. at 327–28. Whether or not these "standard safeguards" technically violated § 11,343(b)'s requirement that Guilford obtain ICC approval before assuming control of the Boston & Maine—a question we do not decide—there is no evidence of the overreaching or bad faith that would justify the

---

**79.** We express no view on whether the ICC may in some circumstances assert jurisdiction under § 11,301 over a carrier that seeks to avoid ICC regulation of its securities by setting up a holding company.

Commission in treating premature control as a major factor in its decision. Thus, the Commission's error, if any, was of no significance.[80]

## VII. CONCLUSION

The ICC's approval of the Maine Central/Boston & Maine merger as a whole is *affirmed.* We *reverse* the Commission's decision denying the protective conditions sought by Lamoille Valley and Canadian National, and *remand* to the Commission to reconsider whether protective conditions (not necessarily the ones sought by Lamoille Valley and Canadian National) are needed to preserve competition or adequate transportation. On all remaining issues, the Commission's decision is *affirmed.*

**80.** We find no merit in Providence & Worcester's remaining procedural quibbles. The ICC has broad discretion in controlling its own calendar. *See Nader v. FCC,* 520 F.2d 182, 196 (D.C.Cir.1975). It did not abuse that discretion in consolidating consideration of the reorganization plan with consideration of the merger proposal. The proceedings were clearly "interdependent." *Boston & Maine Merger,* 366 I.C.C. at 330.

Nor did the Commission abuse its discretion in failing to consolidate Guilford's later-filed application to control the Delaware & Hudson with the instant application. Rather, the Commission simply adhered to its established and reasonable policy that "[t]he proper forum for considering cumulative impacts and crossover effects [due to multiple transactions] is in a later proceeding." 49 C.F.R. § 1180.1(g) (1982). Moreover, since the Commission was bound to decide the Boston & Maine application within 180 days come hell, high water, or consolidation, consolidation would have left the Commission only 90 days to decide the later-filed Delaware & Hudson application.

Finally, the Commission did not abuse its discretion in declining to grant a few of Providence & Worcester's many discovery requests, nor in limiting the time allotted to Providence & Worcester to cross-examine opposing witnesses.